**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ROBERT R. DUFRESNE, as Trustee of the
Dufresne Family Trust;
MICHAEL A. GAFFEY, as Trustee of the Michael A. Gaffey
and JoAnne M. Gaffey Living Trust dated March 2000;
RONALD GLICKMAN, as Trustee of the
Glickman Family Trust est. August 29, 1994; and
JEFFREY SCHULEIN, as Trustee of the
Schulein Family Trust est. March 29, 1989 etc.;

    *Plaintiff*,

      v.

PDC ENERGY, INC., a Delaware corporation,
in its capacity as the General Partner of the
Rockies Region 2006 Limited Partnership and the
Rockies Region 2007 Limited Partnership;
BART R. BROOKMAN, JR., as the Chief Executive Officer
of defendant PDC ENERGY, INC.; and
LANCE A. LAUCK, as the Executive Vice President
of defendant PDC ENERGY, INC.

    *Defendants*,

ROCKIES REGION 2006 LP, a West Virginia
limited partnership; and
ROCKIES REGION 2007 LP, a West Virginia
limited partnership,

    *Nominal Defendants.*

---

## VERIFIED DERIVATIVE COMPLAINT

---

    Plaintiffs Robert R. Dufresne, as Trustee of the Dufresne Family Trust; Michael A.

Gaffey, as Trustee of the Michael A. Gaffey and JoAnne M. Gaffey Living Trust dated March

2000; Ronald Glickman, as Trustee of the Glickman Family Trust established August 29, 1994;

and Jeffrey R. Schulein, as Trustee of the Schulein Family Trust established March 29, 1989

(collectively, "Plaintiffs"), hereby bring this derivative action as limited partners in the Rockies

Region 2006 Limited Partnership and the Rockies Region 2007 Limited Partnership, West

Virginia limited partnerships and the nominal defendants here. By and through their counsel,

Plaintiffs state as follows:

## NATURE OF THE CASE

1.      This case involves a breach of fiduciary duty. Plaintiffs, derivatively on behalf of

the nominal defendants Rockies Region 2006 Limited Partnership and Rockies Region 2007

Limited Partnership (together, the "Partnerships"), seek relief for the damages sustained and to

be sustained by the Partnerships against the Managing General Partner of the Partnerships, PDC

Energy, Inc. ("PDC") for violations of West Virginia state law, including its breaches of

fiduciary duty, abuse of control, gross mismanagement, waste of the Partnerships' assets, and

unjust enrichment, which occurred from 2015 to the present (the "Relevant Period"). PDC's

wrongful conduct also constitutes a breach of its contractual obligations to the Partnerships, as

set forth in the Limited Partnership Agreements (together, the "Partnership Agreements") that

formed the Partnerships.

2.      Defendant PDC is a domestic independent natural gas and crude oil company.

PDC owns, operates, and manages natural gas and crude oil properties located predominantly in

Colorado (the Denver-Julesburg (D-J) and Piceance Basins), Texas (the Permian Basin), and

West Virginia (the Appalachian Basin). In 2006 and 2007, PDC formed the Partnerships to raise

funds to finance the acquisition and development of oil and gas properties primarily in the

Wattenberg Field in the D-J Basin, and attracted thousands of investors who paid tens of millions of dollars for their limited partnership interests.

3.      The two Partnerships at issue in this action were formed by PDC to obtain financing for oil and gas exploration and development in both the D-J and Piceance Basins. The interests the Partnerships owned in those oil and gas properties are very valuable—the D-J Basin includes the Wattenberg Field. According to PDC, the Wattenberg Field, which includes the Niobrara and Codell formations, is PDC's "chief growth driver" in the Rocky Mountain Region, and is one of PDC's "most prized assets." PDC has described the wells drilled in this field to be "very economic." The Piceance Basin fields were also deemed by PDC to be among its important "core" assets.

4.      After raising funds from investors, which enabled PDC to acquire and develop oil and gas leaseholds in these properties, PDC engaged in certain transactions to reap millions of dollars in unlawful profits at the expense of the Partnerships. In breach of the fiduciary duties it owed to the Partnerships, PDC refused to take steps to allow the Partnerships to benefit from the development of their assets and engaged in conduct to actively deprive the Partnerships of the benefit of their properties.

5.      More specifically, PDC failed to take reasonable steps to recomplete or refracture ("refrac") the Partnerships' existing verticals wells that had been drilled on the Partnerships' prospects in the Wattenberg Field.[1] PDC refused to take these steps despite its ability to fund recompletions with the ongoing proceeds from the operation of the Partnerships' existing wells,

---

[1] As discussed in more detail below, a "Prospect" is defined in the Partnership Agreements as "… the drilling or spacing unit on which the well will be drilled by the Partnership."

and despite PDC's representation to investors in the prospectus, prior to the formation of the Partnerships, that such recompletions of the Partnerships' existing vertical wells would be done within 5 to 6 years after the initial drilling of the Partnerships' vertical wells.

6.     PDC also failed to drill infill wells on the Partnerships' spacing units when the State of Colorado in 2009 reduced the minimum spacing unit for a vertical well in the Wattenberg Field from 32 acres to 20 acres. PDC refused to drill such infill wells despite the fact that it drilled infill wells on its own properties in the Wattenberg Field located near the spacing units held by the Partnerships.

7.     In addition, PDC breached its fiduciary duties by failing to utilize other procedures that are standard in the oil and gas industry, and failed to utilize alternative means of developing the Partnerships' prospects expressly permitted by the Partnerships Agreements including, but not limited to, farmouts, pooling, and term assignments to participate in installing horizontal wells on the Partnerships' spacing units in the Wattenberg Field to produce oil and gas on Partnership spacing units. As part of its fiduciary obligations to the Partnerships, PDC was required to fully utilize the Partnerships' assets for the benefit of the Partnership and its limited partners. PDC's failure to do so constitutes waste and is a breach of fiduciary duty.

8.     Furthermore, PDC breached its fiduciary duties by using its position as Managing General Partner to misappropriate the assets of the Partnerships for its own benefit. In particular, PDC has breached its fiduciary duties by (1) profiting, to the exclusion of the Partnerships, from the drilling of horizontal wells that pass through the Partnerships' spacing units; and (2) by entering into an agreement with Noble Energy, Inc. ("Noble") by which PDC traded a portion of the Partnerships' spacing units/acreage for acreage in the Wattenberg Field that are more

contiguous with PDC's own acreage in the Wattenberg Field, allowing PDC to drill longer and more profitable horizontal wells at the expense of the Partnerships' own working interests in their prospects.

9.      PDC's wrongful conduct also constitutes a breach of its contractual obligations to the Partnerships. As the sole intended third-party beneficiary of the Limited Partnership Agreements that formed the Partnerships, the Partnerships are entitled to enforce the terms of those Agreements. Under the terms of the Partnership Agreements, PDC was obligated to assign to the Partnerships "Prospects," which are defined in the Partnership Agreements as a "drilling or spacing unit on which [a] well will be drilled by the Partnership which is the minimum area permitted by state law or local practice on which one well may be drilled." At the time the Partnerships were formed—as confirmed by both the prospectus that PDC utilized to solicit the limited partners to invest and in the Drilling and Operating Agreement executed by PDC as both the operator and Managing General Partner—the minimum drilling or spacing unit in the Wattenberg Field at the time both Partnerships were formed was 32 acres under Colorado law. **Therefore, the terms of the Partnership Agreements unmistakably provide that PDC was obligated to transfer 32-acre spacing units to the Partnerships.** In breach of this obligation, PDC purportedly, and without notice to the limited partners, assigned interests to the Partnerships significantly less than what was mandated by the Partnership Agreements.

10.      It should be noted from the outset that, since at least 1996, PDC funded much of its drilling operations by entering into limited partnerships with investors. But, at some point prior to 2010, PDC determined that it no longer wanted to operate through the use of these partnerships and devised a common plan or scheme by which it would ultimately purchase the

partnerships and their assets at less than the value of those Partnership assets. PDC sought to abandon all of its partnerships so that it would be able to solely benefit from the production that occurs on the acreage in the Wattenberg Field that was (or should have been) assigned to the partnerships.

11.     To accomplish this goal, PDC initially conceived of and implemented a plan to purchase (through cash-out merger transactions) certain of PDC's partnerships by the end of 2012. PDC would have continued to merge with all of the partnerships were it not for the filing of a class action lawsuit, in December 2011, against PDC for breach of fiduciary duty and federal securities violations connected with its plan to purchase the partnerships' assets. *See Schulein v. Petroleum Development Corp.*, No. 11-CV-1891 AG (C.D. Cal. Dec. 7, 2011) (the "*Schulein*" action). Shortly thereafter, PDC halted its overarching plan to purchase the remaining partnerships but, at the same time, refused to take any steps to profitably operate the un-merged partnerships (including the Rockies Region 2006 and 2007 Partnerships) in an effort to make the continued position as a limited partner financially unattractive in anticipation of PDC's future efforts to also purchase the 2006 and 2007 Partnerships. For example, over the past few years, PDC has decided to "plug and abandon" a large number of the Partnerships' wells instead of recompleting the wells, as PDC represented to the limited partners it would do when it was seeking investment for the Partnerships. According to PDC's own statements, more than thirty of the Partnerships' wells have been plugged as of September 2017, with plans to plug nearly fifty more wells before the end of 2017 at a cost of more than $2 million. This is but one example of PDC's ongoing efforts to present the Partnerships' as financially unattractive to encourage the

limited partners to abandon their interests when PDC ultimately seeks to purchase those interests so it can more easily exploit the Partnerships' acreage for its own benefit.

12.     Despite halting the planned mergers of the remaining partnerships because of the filing of the *Schulein* action, PDC devised other ways to obtain partnership assets for its own benefit. In 2014, PDC filed bankruptcy on behalf of certain partnerships that it had formed prior to 2002. Even though the partnerships at issue held the vast majority of their assets in Colorado, PDC filed bankruptcy in Texas in order to obtain a favorable venue. Ultimately, this scheme enabled PDC to purchase those partnerships' assets out of bankruptcy at grossly deflated prices.

13.     In the end, PDC's use of merger transactions and bankruptcy to obtain, for itself, the assets owned by the partnerships provides needed context for PDC's refusal to take any meaningful steps to develop the acreage rightfully owned by the Partnerships at issue here. The wrongful conduct complained of in this complaint is but one more facet of PDC's plan to rid itself of the partnerships and the limited partners to whom it owes fiduciary duties.

## IDENTIFICATION OF THE PARTIES

14.     Plaintiff Robert R. Dufresne, as Trustee of the Dufresne Family Trust, a resident of the State of Florida, is a current limited partner in the Rockies Region 2006 Limited Partnership.

15.     Plaintiff Michael A. Gaffey, as Trustee of the Michael A. Gaffey and JoAnne M. Gaffey Living Trust dated March 2000, a resident of the State of Nevada, is a current limited partner in the Rockies Region 2006 Limited Partnership and the Rockies Region 2007 Limited Partnership.

16.     Plaintiff Ronald Glickman, as Trustee of the Glickman Family Trust established August 29, 1994, a resident of Orange County, California, is a current limited partner in the Rockies Region 2006 Limited Partnership and the Rockies Region 2007 Limited Partnership.

17.     Plaintiff Jeffrey Schulein, as Trustee of the Schulein Family Trust established March 29, 1989 and governed by agreement dated December 5, 2002, a resident of Orange County, California, is a current limited partner in the Rockies Region 2007 Limited Partnership.

18.     Defendant PDC Energy, Inc., a corporation organized under the laws of the State of Delaware with its principal executive offices located in Denver County, Colorado, is the Managing General Partner of the Rockies Region 2006 Limited Partnership and the Rockies Region 2007 Limited Partnership.

19.     Defendant Bart A. Brookman, Jr. is a resident of Denver County, Colorado and is the current President and Chief Executive Officer of defendant PDC Energy, Inc. and is also a member of PDC's Board of Directors. Mr. Brookman was the President and Chief Executive Officer of PDC and a member of PDC's Board of Directors during the Relevant Period.

20.     Defendant Lance A. Lauck is a resident of Denver County, Colorado and is the current Executive Vice President Corporate Development and Strategy of defendant PDC Energy, Inc. Mr. Lauck was the Executive Vice President Corporate Development and Strategy of PDC during the Relevant Period.

21.     Nominal defendant Rockies Region 2006 Limited Partnership maintains its executive offices at 1775 Sherman Street, Suite 3000, Denver, Colorado 80203. The Rockies Region 2006 Partnership is a privately subscribed West Virginia Limited Partnership which owns an undivided working interest in wells located in Colorado, from which it produces and

sells crude oil, natural gas and natural gas liquids ("NGLs"). The 2006 Partnership was organized and began operations in 2006 with cash contributed by limited and additional general partners (collectively, the "Investor Partners") and the Managing General Partner. The Investor Partners own 63% of the 2006 Partnership's units. Defendant PDC is the Managing General Partner of the 2006 Partnership and owns the remaining 37% of the 2006 Partnership's units.

22.     Nominal defendant Rockies Region 2007 Limited Partnership maintains its executive offices at 1775 Sherman Street, Suite 3000, Denver, Colorado 80203. The Rockies Region 2007 Partnership is a privately subscribed West Virginia Limited Partnership which owns an undivided working interest in wells located in Colorado, from which it produces and sells crude oil, natural gas and NGLs. The 2007 Partnership was organized and began operations in 2007 with cash contributed by limited and additional general partners (collectively, the "Investor Partners") and the Managing General Partner. The Investor Partners own 63% of the 2007 Partnership's units. Defendant PDC is the Managing General Partner of the 2007 Partnership and owns the remaining 37% of the Partnership's units.

## JURISDICTION AND VENUE

23.     The Partnerships were formed under West Virginia law. The claims asserted herein arise under West Virginia state law for breach of fiduciary duty and breach of contract.

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(a)(1) because Defendant PDC maintains its executive offices in this Judicial District, defendants Brookman and Lauck reside in this Judicial District, and a substantial portion of the acts and transactions constituting the violations of law alleged in this Complaint occurred in substantial part in this Judicial District. Moreover, Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## FACTUAL ALLEGATIONS

26.     The Rockies Region 2006 Limited Partnership ("Rockies Region 2006") and the Rockies Region 2007 Limited Partnership ("Rockies Region 2007") were organized in 2006 and 2007, respectively, and are limited partnerships formed in accordance with the laws of the State of West Virginia for the purpose of engaging in the exploration and development of crude oil and natural gas properties. Business operations commenced upon closing of the offerings for the private placement of the Partnerships' limited partnership units. Upon funding, each of the Partnerships entered into a Drilling and Operating Agreement ("D&O Agreement") with the Managing General Partner that authorized PDC to conduct and manage the Partnerships' business. Copies of the D&O Agreements were not provided to the limited partners for their review. In accordance with the terms of the Partnerships' organizing documents—their Limited Partnership Agreements—the Managing General Partner is authorized to manage all activities of the Partnerships and to initiate and complete substantially all of the Partnerships' transactions. As of June 30, 2017, there were 1,977 limited partners in the Rockies Region 2006 Limited Partnership and 1,753 limited partners in the Rockies Region 2007 Limited Partnership.

27.     By reason of its position of Managing General Partner of the Partnerships, and because of its ability to control the business and financial affairs of the Partnerships, under West Virginia partnership law PDC owed the Partnerships and the limited partners (1) the duty to exercise due care and diligence in the management and administration of the affairs of the Partnerships and in the use and preservation of their property and assets; (2) the duty of loyalty, to put the interests of the Partnerships above its own financial interests; and (3) the duty of candor, including full and candid disclosure of all material facts related thereto. The conduct of PDC complained of herein involves knowing violations of its duties as General Partner of the Partnerships, and the absence of good faith on its part, which PDC was aware or should have been aware, posed a risk of serious injury to the Partnerships.

28.     Defendants Bart A. Brookman, Jr. and Lance A. Lauck, as officers and/or directors of PDC during the Relevant Period, were responsible for PDC's conduct as it relates to the Partnerships and owed the Partnerships the same fiduciary duties that PDC itself owed the Partnerships. Upon information and belief, Messrs. Brookman and Lauck violated those fiduciary duties by directing PDC to engage in the wrongful conduct alleged herein. Both Messrs. Brookman and Lauck are personally liable for their personal failure to meet their fiduciary obligations to the Partnerships.

29.     As stated above, the Partnerships were formed pursuant to Limited Partnerships Agreements that were executed on one hand by PDC, as the general partner, and on the other hand by the limited partners of the Partnerships. These Limited Partnership Agreements govern the operations of the Partnerships and set forth the rights and duties of PDC as the Managing General Partner. The terms of the Limited Partnership Agreements for both of the Partnerships

are materially identical. Attached hereto as **Exhibits A** and **B** are the Limited Partnership

Agreements for Rockies Region 2006 and Rockies Region 2007 Partnerships, respectively.

30.     Rockies Region 2006 and Rockies Region 2007 Partnerships are both the sole

intended third-party beneficiaries of their respective Partnership Agreements. Thus, the

Partnerships are entitled to enforce the terms of the Partnership Agreements under West Virginia

law. Moreover, the Partnership Agreements are constitutive documents of the Partnerships,

setting forth the rights and obligations of the Managing General Partner, which also empowers

the Partnerships to enforce the terms of the Agreements.

31.     The Partnership Agreements provide that they are the sole agreements between

the parties, constituting their "entire understanding." (Exhibit A at p. 81 (Article XI, § 11.05.)

32.     As a preliminary matter, the Partnership Agreements affirm the fiduciary

obligations of PDC as the Managing General Partner, providing that:

> The Managing General Partner shall have a fiduciary responsibility
> for the safekeeping and use of all funds and assets of the
> Partnership, whether or not in the Managing General Partner's
> possession or control, and shall not employ or permit another to
> employ such funds or assets in any manner except for the exclusive
> benefit of the Partnership.

(Exhibit A at p. 39 (Article V, § 5.02(n)).) Hence, the fiduciary obligations imposed on PDC are

derived from both West Virginia law and also the contractual obligations that PDC voluntarily

assumed when entering into the Partnership Agreements. Of particular importance is the

statement in the Partnership Agreements that PDC is charged with the safekeeping of the

Partnerships' assets, and that those assets can only be used for the "exclusive benefit" of the

Partnerships. Any use of the Partnerships' assets that is not for their exclusive benefit—such as the drilling of horizontal wells by PDC for its own benefit through the Partnerships' acreage that does not benefit the Partnerships, or the wholesale exchange of the Partnerships' acreage for other acreage that allows PDC to benefit from longer horizontal laterals—is a breach of the "fiduciary responsibility" that was voluntarily assumed by PDC and imposed upon it by West Virginia law.

33.     The business of the Partnerships is well defined in the Partnership Agreements. Specifically, the Partnership Agreements define the character of the Partnerships' business, stating that:

> The principal business of the Partnership shall be to acquire Leases, drill sites, and other interests in oil and/or gas properties and to drill for oil, gas, hydrocarbons, and other minerals located in, on, or under such properties, to produce and sell oil, gas, hydrocarbons, and other minerals from such properties, and to invest and generally engage in any and all phases of the oil and gas business. Such business purpose shall include without limitation the purchase, sale, acquisition, disposition, exploration, development, operation, and production of oil and gas properties or any character.

(Exhibit A at p. 4 (Article I, § 1.03).) As confirmed by the express language of the Partnership Agreements, the Partnerships were not intended as mere funding mechanisms for PDC's own drilling operations. Instead, the Partnerships were to be full-fledged participants in the oil and gas industry; "engag[ing] in any and phases of the oil and gas business." As defined by the Partnership Agreements, the scope of the Partnerships' business is exceedingly broad.

34.     In order for the Partnerships to engage in the oil and gas business, PDC stated in the initial Prospectus for both Partnerships that PDC, as the Managing General Partners, would identify "Prospects" on which the Partnership would conduct its drilling operations. Attached hereto as **Exhibits C** and **D** are the Private Placement Offering Memoranda (hereafter, "Prospectus" or "Prospectuses") for Rockies Region 2006 and Rockies Region 2007 Partnerships, respectively. The term "Prospect" is defined in the Prospectuses for both Partnerships as follows: "The drilling or spacing unit on which the well will be drilled by the Partnerships which is the minimum area permitted by state law or local practice on which one well may be drilled." (Exhibit C at p. 117.)

35.     Moreover, the Prospectuses for both Partnerships, in describing PDC's drilling policy, confirmed that the Partnerships would invest in a number of "prospects" which would be a minimum of 32 acres in the Wattenberg Field:

> The partnership will invest in a number of prospects, either by itself, or in conjunction with other parties, consistent with the objective of maintaining a meaningful interest in the wells to be drilled. … The spacing unit for Colorado wells will encompass approximately 32 acres for wells drilled in the Wattenberg Field and approximately 10-20 acres for wells drilled in the Grand Valley Field, however smaller units may be utilized, provided the reduced spacing unit has been approved by the appropriate state regulatory authority. …

(Exhibit C at p. 50.)

36.     As stated above, PDC entered into Drilling and Operating Agreements with the Partnerships, acting as both the Managing General Partner of the Partnerships and as the

"Operator." Attached hereto as **Exhibits E** and **F** are the Drilling and Operating Agreements for Rockies Region 2006 and Rockies Region 2007 Partnerships, respectively. Importantly, the D&O Agreements provide that the Partnerships were formed "to explore and develop certain Prospects for the production of oil and gas as hereinafter provided. …" (Exhibit E at p. 1.) The D&O Agreements for both Partnerships define a "Prospect" as follows: "The term 'Prospect' shall be deemed to consist of the drilling or spacing unit on which the well will be drilled by the partnership which is the minimum area permitted by state law or local practice on which one well may be drilled." (*Id.*)

37.     The Partnership Agreements expressly define "Prospect" as the following: "[A] 'Prospect' shall be deemed to consist of the drilling or spacing unit on which the well will be drilled by the Partnership which is the minimum area permitted by state law or local practice on which one well may be drilled." (Exhibit A at p.17 (Article I, § 1.08(vv).)[2] Thus, a Prospect is synonymous with the 32-acre drilling or spacing unit mandated by Colorado law at the time the Partnerships were formed. The Partnership Agreements go on to provide that:

> The Managing General Partner shall establish a program of
> operations for the Partnership which shall be in conformity with
> the following policies: … **Prospects** will be acquired pursuant to
> an arrangement whereby the Partnership will acquire up to 100%

---

[2] Similarly, Section 5.07 of the Partnership Agreements, titled "Certain Transactions," provides the following: "A Prospect shall be deemed to consist of the drilling or spacing unit on which the well will be drilled by the Partnership, which is the minimum area permitted by state law or local practice on which one well may be drilled, for wells drilled on the Company's Puckett or Chevron leasehold in Garfield County, Colorado; on the Company's Bakken or Nesson leasehold located in North Dakota or on development prospects in the Greater Wattenberg Field Area in Colorado." (Exhibit A at p. 45.)

> of the Working Interest, subject to landowners' royalty interests
> and the royalty interests payable to unaffiliated third parties in
> varying amounts, provided that the average of the maximum
> royalty interests for all Prospects of the Partnership shall not
> exceed 25%.

(Exhibit A at pp. 39–40 (Article V, § 5.02(a)(1)(z).) The Partnerships Agreements provide that a

"Working Interest" is defined as "an interest in an oil and gas leasehold which is subject to some

portion of the costs of development, operation, and maintenance." (*Id.* at § 1.08(iii).)

38.     Thus, PDC was to acquire Prospects and assign the **entire** Working Interest in

those Prospects to the Partnerships subject **only** to the royalty interests of landowners and other

third parties. There is no reference in the Partnership Agreements to some smaller amount of

acreage being transferred to the Partnerships.

39.     Furthermore, as to the Partnerships' business to "acquire Leases," the Partnership

Agreements provide, at Section 5.04, that:

> Record title to each Lease acquired by the Partnership may be
> temporarily held in the name of the Managing General Partner, or
> in the name of any nominee designated by the Managing General
> Partner, as agent for the Partnership until a productive well is
> completed on a Lease. **Thereafter, record title to Leases shall be
> assigned to and placed in the name of the Partnership.**

(*Id.* at p. 43 (emphasis added).) Thus, PDC is obligated to obtain record title to "Leases" and to

later assign those "Leases" to the Partnerships. The plain language of this provision means that

PDC was obligated to transfer, **in its entirety**, the "Leases" obtained for the Partnerships' behalf.

16

40.     To bolster this conclusion, the Partnership Agreements provide in Section 5.03 titled "Acquisition and Sale of Leases," that:

> Any Leases acquired by the Partnership from the Managing General Partner shall be acquired only at the Managing General Partner's Cost, unless the Managing General Partner shall have reason to believe that Cost is in excess of the fair market value of such property, in which case the price shall not exceed the fair market value. … [¶] … Neither the Managing General Partner nor its Affiliates, except other partnerships sponsored by them, shall purchase any productive properties from the Partnership.

(Exhibit A at p. 42.) In other words, PDC was obligated to provide to the Partnerships the Leases that PDC obtained for the Partnerships' benefit using the Partnerships funds at either (1) the cost PDC itself paid for the Lease, or (2) the fair market value of the leased property, whichever was less. PDC was able to charge the Partnerships the full value of the Lease that it obtained but it could not do so if the cost exceeded fair market value. Importantly, the fact that PDC was able to charge the Partnerships the full cost of the Lease that was to be assigned to the Partnerships demonstrates that PDC was required to assign the **entirety** of the Lease to the Partnerships and not a lesser wellbore interest.

41.     Moreover, the Partnership Agreements also provide that: "During the existence of the Partnership, and before it has ceased operations, neither the Managing General Partner nor any of its Affiliates … shall acquire, retain, or drill for their own account any oil and gas interest in any Prospect in which the Partnership possesses an interest." (Exhibit A at p. 45 (Article V, § 5.07(c).) Thus, PDC was forbidden from obtaining any oil and gas interest, on any Prospect assigned to one of the Partnerships, for the entire duration of the Partnerships. In addition,

"[n]either the Managing General Partner nor an Affiliate … may purchase or acquire any property from the Partnership, directly or indirectly, except pursuant to transactions that are fair and reasonable to the Investor Partners of the Partnership …" (Exhibit A at p.47 (Article V, § 5.07(i).)

42.     Furthermore, as to the allocation of profits and losses among the partners, the Partnership Agreements provide that: "Profits and Losses during the production phase of the Partnership shall be allocated 63% to the Investor Partners and 37% to the Managing General Partner." (Exhibit A at p. 26 (Article III, § 3.02(a).)

43.     After both Partnerships were formed, and with no notice to the limited partners, PDC entered into an Assignment of Working Interests ("Assignment") for each Partnership whereby PDC purported to assign to the Partnerships a "wellbore" interest instead of a 32-acre spacing unit as required by Colorado law and local regulation.[3] PDC now takes the position that PDC, as Managing General Partner, assigned to both Partnerships one specific vertical well on each 32-acre spacing unit in the Wattenberg Field, and that PDC reserved to itself, in the Assignment, the remainder of the lease and the leasehold oil and gas estate, including the right to produce other wells that might subsequently be located on the lands described in the leasehold and land pooled therewith without the obligation to account to the Partnerships for any production from the subsequently drilled wells. Thereafter, PDC drilled horizontal wells through

---

[3] PDC did not provide the limited partners with copies of the Assignments for either of the Partnerships. Instead, PDC filed the Assignments with the Securities and Exchange Commission—the Assignment for Rockies Region 2006 was filed with the SEC on December 24, 2007, and the Assignment for Rockies Region 2007 was filed with the SEC on August 6, 2008. A claim for breach of a written contract has a ten-year statute of limitations under West Virginia law. (W. Va. Code § 55-2-6.)

spacing units assigned to many of its drilling partnerships, which had the effect of draining oil and gas from the partnerships vertical wells, and PDC refused to provide any of the revenues from those horizontal wells to the partnerships.

44.     PDC's motivation to rid itself of its relationship to the Partnerships is clear; having used the Partnerships to develop the Partnerships' Prospects, it no longer wants to share the income with the Limited Partners from any future production on those Partnership Prospects. PDC embarked on a campaign to wrest, from all the limited partnerships it formed, the right to future production in the Wattenberg Field for subsequently drilled wells. For example, in 2013 PDC filed bankruptcy proceedings for 12 separate drilling partnerships that had not filed mandatory Form-8K and 10K filings with the Securities and Exchange Commission. PDC thereafter requested the bankruptcy court to auction off the assets of those 12 partnerships, and PDC was the sole bidder at the auction of the assets of the 12 partnerships.[4] (*See In re* Eastern 1996D Limited Partnership, No. 13-34773 [Doc. 158] (N.D. Tex. Bankr. Dec. 13, 2013) ("Supplemental Order Granting Amended Motion to Sell Property").

45.     Another example of PDC wresting away partnership interests from the limited partners is the *Schulein* Action referenced above. In 2010, PDC began sending proxy statements to the limited partners in another 12 partnerships that were formed between 2002 and 2005, offering to purchase the assets of those partnerships. However, the limited partners in those partnerships brought a class action lawsuit against PDC, alleging that the company made

---

[4] The limited partnerships included in the 2013 bankruptcy sale include the: (1) Eastern 1996D LP; (2) Eastern 1997D LP; (3) Eastern 1998D LP; (4) Colorado 2000B LP; (5) Colorado 2000C LP; (6) Colorado 2000D LP; (7) Colorado 2001A LP; (8) Colorado 2001B LP; (9) Colorado 2001C LP; (10) Colorado 2001D LP; (11) Colorado 2002A LP; and (12) CO and PA 1999D LP.

material misrepresentations and omitted material facts in the proxy statements it issued. Ultimately, PDC paid $37,000,000 dollars to the limited partners in those partnerships to settle their claims for securities fraud and breach of fiduciary duty.[5]

46.     PDC has breached the fiduciary duties owed to the Partnerships by failing to refrac or complete the initial vertical wells that were drilled on the Partnerships' spacing units. PDC refused to take these steps despite its ability to fund recompletions with the ongoing proceeds from the operation of the Partnerships' existing vertical wells, or from borrowing as expressly permitted by the Partnership Agreements.

47.     In addition, PDC represented, in its prospectuses delivered to potential investors in the Partnerships, that it would recomplete the Partnerships' initial vertical wells within 5 or 6 years after those initial wells were drilled. More specifically, in the Private Placement Offering Memorandum for the Rockies Region 2006 Limited Partnership, it provides that:

> If the partnership participates in Codell formation wells in Wattenberg Field, we expect to be able to 'recomplete' the Codell formation after the wells have been in production for 5 years or more. … PDC has recompleted over 180 Codell wells to date. Substantially all of those wells have experienced significant production increases. [¶] Currently we plan to recomplete most Codell wells that the partnership drills after approximately six years of production, although the exact timing may be delayed if we are experiencing a period of low prices or for operational

---

[5] The limited partnerships involved in the *Schulein* Action include the: (1) PDC 2002-D LP; (2) PDC 2003-A LP; (3) PDC 2003-B LP; (4) PDC 2003-C LP; (5) PDC 2003-D LP; (6) PDC 2004-A LP; (7) PDC 2004-B LP; (8) PDC 2004-C LP; (9) PDC 2004-D LP; (10) PDC 2005-A LP; (11) PDC 2005-B LP; (12) and Rockies Region Private LP.

> reasons. The partnership may borrow the funds necessary to pay
> for the recompletions, and payment for those loans will be made
> from the partnership production proceeds, or may enter into joint
> venture or other arrangements to finance the recompletions.

(Exhibit C at p. 50.) The same document also provided that: "The partnership will invest in a number of prospects," that the "partnership is expected to acquire spacing units on each prospect," and that the "spacing unit for Colorado wells will encompass approximately 32 acres for wells drilled in the Wattenberg Field." (*Id.*) Thus, PDC represented to the limited partners in the prospectuses that it distributed, that it was going to recomplete the Partnerships' initial wells, and that PDC had already successfully and profitably recompleted a large number of vertical wells in the Wattenberg Field.

48.     In addition, the Partnership Agreements provide that: "The Managing General Partner may in its discretion conduct recompletion and further development services with respect to the Partnership's wells in the Greater Wattenberg Field Area that the Managing General Partner determines may enhance the recovery of oil and natural gas from such wells." (Exhibit A at p. 41 (Article V, § 5.02(a)(3).)

49.     The recompletion of the Partnerships' wells was and continues to be a viable option to increase the Partnerships' production and revenue. PDC has chosen not to recomplete the Partnerships' wells because it wants to depress the Partnerships' production in an effort to make continued participation in the Partnerships' operations economically unappealing. This is demonstrated by, among other things, PDC's stated success as recompleting other vertical wells located in the same area in which the Partnerships' wells in the Wattenberg are located.

50.     On this issue, it is important note that the Partnerships possess the ability to use the proceeds from its drilling operations to further develop its assets:

> … revenues from Partnership operations may be used for other Partnership operations, including without limitation for the purposes of drilling, completing, maintaining, recompleting, and operating wells on existing Partnership Prospects and acquiring and developing new Leases to the extent such Leases are considered by the Managing General Partner in its sole discretion to be a part of a Prospect in which the Partnership then owns a Lease.

(Exhibit A at p. 54 (Article VI, § 6.03(a).) For example, a few recompletions could be used to fund even more recompletions by the Partnerships or even the funding of a horizontal well by the Partnerships on the Partnerships' acreage. None of these options has been explored by PDC for the simple reason that it is not interested in allowing the Partnerships to obtain the benefit of development of their own oil and gas interests on their prospects.

51.     PDC has breached its fiduciary duties by failing to utilize other procedures expressly permitted by the Partnership Agreements that are standard in the oil and gas industry, including but not limited to farmouts, pooling, carried interests, overrides and term assignments, or a combination of these procedures to participate in installing horizontal wells on the Partnerships' spacing units in the Wattenberg Field to produce oil and gas on Partnership spacing units. In fact, the Partnership Agreements specifically provides that the Managing General Partners has the authority to:

> Enter into and execute pooling agreements, farm out agreements, operating agreements, unitization agreements, dry and bottom hole

> and acreage contribution letters, construction contracts, joint
> venture or other arrangements with or on behalf of the Partnership,
> and any and all documents or instruments customarily employed in
> the oil and gas industry in connection with the acquisition, sale,
> exploration, development, or operation of oil and gas properties,
> and all other instruments deemed by the Managing General Partner
> to be necessary or appropriate to the proper operation of oil or gas
> properties or to effectively and properly perform its duties or
> exercise its powers …

(Exhibit A at p. 52 (Article VI, § 6.02(b).) As with PDC's refusal to recomplete the Partnerships'

existing vertical wells, PDC's refusal to utilize other means to increase production on the

Partnerships' acreage is intended to make continued participation in the Partnerships operations

economically unattractive in furtherance of its overall scheme to ultimately purchase the assets

of the Partnerships for its own benefit. Importantly, PDC ongoing contention, that there are no

"economically feasible" options to develop the Partnerships' assets, is false because many of the

aforementioned procedures would not require the Partnerships to spend a single dollar to obtain

profits from their assets.

      52.     In addition, PDC has gone beyond refusing to recomplete the Partnerships'

vertical wells by plugging and abandoning the Partnerships' wells. In a recent communication to

the limited partners of the Partnerships, PDC stated that, as of September 2017, it has plugged 31

of the Partnerships' vertical wells (14 for Rockies Region 2006 and 17 for Rockies Region

2007). PDC also stated that it intends to plug and abandon between 35 and 45 additional vertical

wells before the end of 2017. The work to plug these wells will costs the Partnerships between

$1,750,000 and $2,200,000. Attached as **Exhibit G** is a true and correct copy of PDC's October

9, 2017 correspondence informing the limited partners of its intent to plug and abandon Partnership wells. This is an additional example of PDC's ongoing efforts to present the Partnerships' as financially unattractive to encourage the limited partners to abandon their interests when PDC ultimately seeks to purchase those interests so it can more easily exploit the Partnerships' acreage for its own benefit.

53.     PDC's conduct is particularly egregious when one considers that PDC itself has used means to fund its own drilling operations that are equally available to the Partnerships. In 2013, PDC sold its own interest and the Partnerships' acreage in the Piceance Basin in order to further fund its operation in the Wattenberg Field. However, PDC did not use the proceeds from the sale of the Partnerships' interests of the remaining, unmerged partnerships in the Piceance Basin to assist the Partnerships in taking advantage of further developing their Wattenberg assets. Instead, PDC simply returned the proceeds from the sale to the limited partners interests in the Piceance Basin claiming, at the same time, that the development of the Partnerships' Wattenberg assets cannot move forward based on a lack of funds.

54.     PDC's recent agreement to "swap" acreage owned by the Partnerships is an additional breach of PDC's ongoing fiduciary obligations to the Partnerships. On June 16, 2016, PDC announced that it had entered into an agreement with Noble Energy, Inc. ("Noble") to strategically trade or "swap" acreage held by the two companies in the Core Wattenberg area in Colorado. In its Form 10-K filing for fiscal year 2016, PDC disclosed this "swap" transaction, providing that:

> Pursuant to the transaction, we exchanged leasehold acreage and,
> to a lesser extent, interests in certain development wells. Upon

> closing, we received approximately 13,500 net acres in exchange
> for approximately 11,700 net acres, with no cash exchanged
> between the parties. The difference in net acres was primarily due
> to variances in leasehold net revenue interests and third-party mid-
> stream contracts. This acreage trade has resulted in opportunities
> for longer length horizontal laterals with increased working
> interests, while minimizing potential surface impact.

(Attached as **Exhibit H** is PDC's Form 10-K for fiscal year ending Dec. 31, 2016, United States Securities and Exchange Commission, Commission File No. 001-37419.) And, in a June 2016 press release, PDC stated that: "Pursuant to the terms of the Agreements, this strategic trade includes leasehold acreage only, and does not include production or wellbores." Attached as **Exhibit I** is a true and correct copy of PDC's June 2016 press release. The swap with Noble allowed PDC to consolidate its and the Partnerships' holding in the Wattenberg Field, providing it with more contiguous acreage, which in turn will allow PDC to drill longer and more profitable horizontal wells on Partnership acreage.

55.     On October 10, 2016, PDC recorded the Memorandum of Agreement between itself and Noble, which contained the terms of the swap agreement between the two companies. In that filing, PDC identified the specific leases that were included in the swap. These are leases that were in PDC's possession but were transferred or assigned to Noble in exchange for other acreage in the Wattenberg Field.

56.     A review of the leases that PDC transferred or assigned to Noble as part of the swap agreement reveals that several of the leases that were assigned or transferred were leases that were or should have been assigned to the Rockies Region 2006 or Rockies Region 2007

Limited Partnerships. Thus, PDC traded a portion of the Partnerships' spacing units/acreage for acreage that is more contiguous with **PDC's own acreage** in the Wattenberg Field, allowing PDC to drill longer and more profitable horizontal wells at the expense of the Partnerships' own working interests in their prospects. In the end, PDC traded acreage that was owned (or should have been owned) by the Partnerships in order to obtain acreage, for itself, that enabled it to drill longer and more profitable horizontal wells. PDC did so without the permission of the Partnerships and without the Partnerships receiving any compensation for those assets transferred to Noble in the swap.

## DERIVATIVE ALLEGATIONS

57.     Plaintiffs bring this action derivatively in the right and for the benefit of the Partnerships to redress the injuries suffered, and to be suffered, by the Partnerships as a direct result of the breach of fiduciary duty, waste of corporate assets, and unjust enrichment, alleged herein. The Partnerships are named as nominal defendants solely in a derivative capacity.

58.     Plaintiffs will adequately and fairly represent the interest of the Partnerships in enforcing and prosecuting their rights.

59.     Plaintiffs are and have continuously been limited partners of the Partnerships during the wrongful conduct alleged herein.

60.     On or about August 29, 2017, a written demand letter was sent on behalf of Christopher Rodenfels, the trustee of the Christopher Rodenfels of the Christopher J. Revocable Trust established May 10, 2000 on behalf of the 2006 and 2007 Partnerships to PDC, as Managing General Partner, demanding that the board of directors of PDC initiate legal proceedings, on behalf of the Partnerships, to enforce the rights set forth in this Complaint. The

Rodenfels Trust is a limited partner of both the 2006 and 2007 Partnerships. Attached as **Exhibit J** is a true and correct copy of the Rodenfels Trust's August 29, 2017 demand letter. On November 13, 2017, counsel for PDC sent a letter acknowledging receipt of the Rodenfels' Trust's August 29, 2017 letter, and stated that PDC was formulating a response to the demand letter and requesting to schedule an interview with Mr. Rodenfels regarding the claims made on behalf of the Partnerships "in the next month or so"; a true and correct copy of that November 13, 2017 letter is attached hereto as **Exhibit K**.

61.     On November 15, 2017, counsel for Plaintiffs emailed PDC's attorneys with potential dates on which the requested interview with Mr. Rodenfels could take place, and informed PDC's counsel that because of upcoming statute of limitations deadlines the requested interview had to be scheduled in the near future.  Later the same day, November 15, 2017, counsel for PDC responded that they would confer with their client regarding scheduling of interviews; a copy of Plaintiffs counsels' email dated November 15, 2017 and a copy of PDC's counsels' responsive email dated 11/15/2017 is attached **Exhibit L** attached hereto.

62.     A second demand letter dated November 16, 2017 was sent by Plaintiffs Robert R. Dufresne, Michael A. Gaffey, Robert Glickman, and Jeffrey Schulein to PDC, on behalf of the Rockies Region Partnerships, to the board of directors of PDC demanding that the board cause PDC to file suit on behalf of the 2006 and 2007 Partnerships against PDC seeking the same relief as the earlier August 29, 2017 letter; a true and correct copy of that November 16, 2017 letter is attached hereto as **Exhibit M**.  The November 16, 2017 demand letter sent by Messrs. Dufresne, Gaffey, Glickman and Schuelin incorporated by reference the claims made on behalf of the Partnerships in the Rodenfels' Trust's demand letter dated August 29, 2017.

63.     On November 22, 2017, PDC's counsel sent a letter acknowledging receipt of the November 16, 2017 demand letter on behalf of Messrs. Dufresne, Gaffey, Glickman and Schulein, and stated that PDC was considering the allegations in the demand letter; a true and correct copy of that November 22, 2017 letter is attached hereto as **Exhibit N**. No further response setting forth PDC's response has been received to the November 16, 2017 demand letter on behalf of Messrs. Dufresne, Gaffey, Glickman and Schulein.

64.     In an email dated November 27, 2017 counsel for Plaintiffs Dufresne, Gaffey, Glickman and Schulein sent an email inquiring if PDC wanted to schedule interviews with Messrs. Dufresne, Gaffey, Glickman and Schulein; a true and correct copy of that email dated November 27, 2017 is attached hereto as **Exhibit O**.  Despite the fact that counsel for Messrs. Dufresne, Gaffey, Glickman and Schulein informed counsel for PDC that the interviews had to be scheduled soon because of upcoming statute of limitations deadlines, more than thirty days having elapsed, PDC's counsel has not communicated any proposed dates to schedule interviews with Mr. Rodenfels or Messrs. Dufresne, Gaffey, Glickman and Schulein.

65.     Plaintiffs made the aforementioned demand on PDC out of an abundance of caution and assert that a demand on PDC is likely a futile, wasteful, and useless act for the following reasons:

(a)     In order to bring this action, Defendant PDC would be required to sue itself as the sole general partner of the Partnerships. For this reason, PDC cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against itself. Based on this manifest conflict of interest, Defendant PDC cannot validly exercise its

business judgment and is incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

(b)     The wrongful conduct alleged herein constitutes self-dealing, whereby Defendant PDC breached and abandoned its fiduciary duties to the Partnerships in order to benefit itself. As the sole general partner, Defendant PDC participated in, approved, and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs and, therefore, are not disinterested parties. Defendant PDC was at all relevant times responsible for conducting and managing the Partnerships' activities. As the sole general partner, the Partnerships may only act through the authority and conduct of Defendant PDC.

(c)     There was no basis or justification for PDC's conduct. It was designed solely to benefit PDC in a manner that is inconsistent with PDC's fiduciary duties to the Partnerships and was detrimental to the Partnerships. Hence, the transactions constituted a waste of the Partnerships' assets, and could not have been the product of the proper exercise of business judgment by PDC as General Partner.

(d)     By instituting an action against itself for the wrongful conduct alleged herein, Defendant PDC would be forced to acknowledge certain disclosures made by PDC to the Securities and Exchange Commission ("SEC") concerning the financial condition of the Partnerships were materially false or misleading and therefore amount to securities fraud. Thus, any suit brought by Defendant PDC to remedy the wrongs complained of herein would also expose it to suit for securities fraud. Therefore, Defendant PDC is hopelessly conflicted in

making any supposedly independent determination of a demand that it cause the Partnerships to bring this action.

(e)      Despite these clear breaches of duty, defendant PDC has not been relieved of its duties as General Partner, nor has PDC disclosed this conflict to the Partnerships.

## FIRST CLAIM FOR RELIEF

### FOR BREACH OF FIDUCIARY DUTY

**(Brought by Plaintiffs, on Behalf of the Partnerships, Against All Defendants)**

66.      Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

67.      Defendant, as the general partner of each of the Partnerships, owed fiduciary duties to all of the limited partners in each such Partnership. In addition, PDC is in possession of material non-public information concerning the value of the Partnerships' assets, business, and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between PDC and the limited partners.

68.      Defendants have breached their fiduciary duties owed to the Partnerships and their limited partners by, among other things:

(a)      Failing to take reasonable steps to recomplete or refracture ("refrac") the Partnerships' vertical wells in the Wattenberg Field, when similar efforts had proven effective on vertical wells that PDC maintained on non-Partnership acreage;

(b)     Failing to drill infill wells on the Partnerships' spacing units when the State of Colorado in 2009 reduced the minimum spacing unit for a vertical well in the Wattenberg Field;

(c)     Failing to utilize other procedures that are standard in the oil and gas industry, including but not limited to farmouts, pooling, and term assignments to participate in developing horizontal wells on the Partnerships' spacing units in the Wattenberg Field;

(d)     Profiting, to the exclusion of the Partnerships, from the drilling of horizontal wells that pass-through Partnership spacing units and drain available oil and natural gas which belong to the Partnerships; and

(e)     By entering into an agreement with Noble by which PDC traded a portion of the Partnerships' spacing units/acreage for acreage that is more contiguous with PDC's own acreage in the Wattenberg Field, allowing PDC to drill longer and more profitable horizontal wells at the expense of the Partnerships' own working interests in their prospects

69.     By reason of the foregoing common wrongful course of conduct, Defendants breached their fiduciary obligations owed to the Partnerships for their own gain at the expense of the limited partners.

70.     As a direct and proximate cause of Defendants' wrongful course of conduct, the Partnerships suffered damages, the exact extent of which will be proven at trial, and Defendants were unjustly enriched.

71.     The conduct of PDC in breaching its fiduciary duties as set forth in this cause of action constitutes gross fraud, malice, oppression, or wanton, willful or reckless conduct or criminal indifference to civil obligations, and justify an award of punitive damages.

## SECOND CLAIM FOR RELIEF

### FOR BREACH OF CONTRACT

**(Brought by Plaintiffs, on Behalf of the Partnerships, Against Defendant PDC)**

72.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

73.     Rockies Region 2006 and Rockies Region 2007 are the sole intended third-party beneficiaries of their respective Partnership Agreements and are therefore able to bring an action to enforce their terms. Moreover, the Partnerships are further empowered to enforce the terms of the Partnership Agreements because those Agreements are constitutive documents of the Partnerships, setting forth the obligations and duties of the Managing General Partner owed to the Partnerships.

74.     Defendant PDC breached its contractual obligations to the Partnerships by, among other things, failing to assign oil and gas interests in prospects (minimum 32 acre spacing units) to the Partnerships in accordance with the terms of the Partnership Agreements.

75.     PDC also failed to recomplete the Partnerships vertical wells, or to drill additional infill wells permitted which Colorado changed the minimum acreage for spacing units for vertical wells in the Wattenberg Field. Had PDC recompleted the vertical wells and drilled the infill wells, the Partnerships would have had the funds to drill horizontal wells on their prospects in the Wattenberg Field.

76.     By swapping the Partnerships prospects in the Wattenberg Field to Noble and not paying any value for the Partnerships interests in the prospects transferred to Noble, and not

allocating the Partnerships any portion of the leasehold interests that PDC received from Noble as a result of the swap transaction.

77.     By reason of the foregoing common wrongful course of conduct, Defendants breached their contractual obligations owed to the Partnerships for their own gain at the expense of the limited partners

78.     As a direct and proximate cause of Defendants' wrongful course of conduct, the Partnerships suffered damages, the exact extent of which will be proven at trial.

## THIRD CLAIM FOR RELIEF

### FOR DECLARATORY RELIEF

**(Brought by Plaintiff, on Behalf of the Partnerships, Against Defendant PDC)**

79.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

80.     An actual controversy has arisen and not exists between the parties with respect to the nature and extent of the Partnerships' property interests. On one hand, Plaintiffs assert that Defendant PDC assigned to them, or was obligated to assign to them, prospects being leasehold interests in spacing units with a minimum of 32 acres. On the other hand, and upon information and belief, Defendant PDC contends that only a "wellbore interest" (or other lesser interest) was assigned to the Partnerships.

81.     Pursuant to 28 U.S.C. §§ 2201 and 2202, a judicial determination of the respective rights of the parties with respect to Partnerships' property interests is necessary and appropriate under the circumstances.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment, as follows:

A.      Award damages in favor of the Partnerships against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

B.      Award equitable relief to the Partnerships;

C.      Award of punitive damages;

D.      Award Plaintiffs their reasonable attorney fees, costs, and expenses incurred in this action, including expert fees;

E.      Award such other and further relief as the Court may deem just and proper.


Dated: December 20, 2017


By ___/s/ Thomas G. Foley, Jr._____

THOMAS G. FOLEY, JR.
tfoley@foleybezek.com
KEVIN D. GAMARNIK
kgamarnik@foleybezek.com
AARON L. ARNDT
aarndt@foleybezek.com
FOLEY BEZEK BEHLE & CURTIS, LLP
15 West Carrillo Street
Santa Barbara CA 93101
Telephone: (805) 962-9495
Facsimile: (805) 962-0722

Attorneys for Plaintiffs

## **VERIFICATION**

I, Robert Dufresne, hereby declare as follows:

I am the trustee of the Robert Dufresne Family Revocable Trust, one of the plaintiffs in the within entitled derivative action. I have read the Verified Derivative Complaint brought on behalf of the Rockies Region 2006 Limited Partnership and the Rockies Region 2007 Limited Partnership. Based upon discussions with, and reliance upon my counsel, and as to those facts of which I have personal knowledge, I am informed and believe that the allegations in Verified Derivative Complaint are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing it true and correct.

Signed and Accepted:                    Dated: December 19, 2017



Robert Dufresne

As Trustee

## VERIFICATION

I, Michael A. Gaffey, hereby declare as follows:

I am the trustee of the Michael A. Gaffey, as Trustee of the Michael A. Gaffey and JoAnne M. Gaffey Living Trust dated March 2000, one of the plaintiffs in the within entitled derivative action. I have read the Verified Derivative Complaint brought on behalf of the Rockies Region 2006 Limited Partnership and the Rockies Region 2007 Limited Partnership. Based upon discussions with, and reliance upon my counsel, and as to those facts of which I have personal knowledge, I am informed and believe that the allegations in Verified Derivative Complaint are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing it true and correct.

Dated: December 19, 2017

Michael A. Gaffey, Trustee

## VERIFICATION

I, Ronald Glickman, hereby declare as follows:

I am co-trustee of the Glickman Family Trust dated August 29, 1994, one of the plaintiffs in the within entitled derivative action. I have read the Verified Derivative Complaint brought on behalf of the Rockies Region 2006 Limited Partnership and the Rockies Region 2007 Limited Partnership. Based upon discussions with, and reliance upon my counsel, and as to those facts of which I have personal knowledge, I am informed and believe that the allegations in Verified Derivative Complaint are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing it true and correct.

Signed and Accepted:                    Dated: December 19, 2017


Ronald Glickman

As co-Trustee

## **VERIFICATION**

I, Jeffrey Schulein, hereby declare as follows:

I am the Trustee of the Schulein Family Trust dated March 29, 1989, one of the plaintiffs in the within entitled derivative action. I have read the Verified Derivative Complaint brought on behalf of the Rockies Region 2006 Limited Partnership and the Rockies Region 2007 Limited Partnership. Based upon discussions with, and reliance upon, my counsel as to those facts of which I have personal knowledge, I am informed and believe that the allegations in Verified Derivative Complaint are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing it true and correct.

Dated: December 18 2017

Jeffrey Schulein

As Trustee