MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
DAVIDA P. BROOK (275370)
dbrook@susmangodfrey.com
KRYSTA KAUBLE (280951)
kkauble@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA  90067-6029
Telephone:  (310) 789-3100
Fax:  (310) 789-3150

THOMAS G. FOLEY, JR. (65812)
tfoley@foleybezek.com
JUSTIN P. KARCZAG (223764)
jkarczag@foleybezek.com
FOLEY BEZEK BEHLE & CURTIS LLP
15 West Carrillo Street
Santa Barbara, CA  93101
Telephone:  (805) 962-9495
Fax:  (805) 962-0722

Attorneys for Plaintiffs

(See Signature Page for Names and Addresses
of Additional Counsel for Plaintiffs)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| JEFFREY SCHULEIN, et al.,<br><br>                          Plaintiffs,<br><br>          vs.<br><br>PETROLEUM DEVELOPMENT CORPORATION and DP 2004 MERGER SUB LLC,<br><br>                          Defendants.<br><br>AND RELATED COUNTER CLAIM | Case No. SACV 11-1891 AG(ANx)<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT**<br><br>Hon. Andrew J. Guilford<br><br>**Date:**  April 28, 2014<br>**Time:**  10:00 a.m.<br>**Place:**  Courtroom 10D<br><br>Discovery Cut-Off:  February 20, 2014<br>Pre-Trial Conference:  May 5, 2014<br>Trial:  May 20, 2014 |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ..........................1

II.     LEGAL STANDARD....................................................................6

III.    ARGUMENT ...............................................................................7

    A.      PDC Is Not Entitled to Summary Judgment on the Fiduciary Claim. ....................................................................................7

        1.      PDC's Arguments Are Unavailing...........................11

            a.      Under West Virginia Law, PDC Owed Plaintiffs Traditional Fiduciary Duties of Due Care and Loyalty. .11

            b.      PDC's Other Arguments Are Likewise Unavailing........13

    B.      DP 2004 Merger Sub, LLC is Liable for Breach of Fiduciary Duty. .................................................................................15

    C.      Scienter is Not an Element of a Section 14(a) Claim ......................15

    D.      PDC Is Not Entitled to Partial Summary Judgment on the §14a Claim. ..................................................................................17

        1.      Net Present Value Discount Rates.............................17

        2.      Probable and Possible Reserves. ...............................18

        3.      Special Committee....................................................20

    E.      The Scope of Plaintiffs' Assignment Cannot be Resolved on Summary Judgment...........................................................21

    F.      The Jury Could Appropriately Find that Plaintiffs are Entitled to Punitive Damages                                                                 25

IV.     CONCLUSION .......................................................................... 25

# TABLE OF AUTHORITIES

Page

<u>**Cases**</u>

*Allen v. Penn Cent. Co.*,
  350 F. Supp. 697 (E.D. Pa. 1972) .......................................................... 25

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................. 7

*Auriga Capital Corp. v. Gatz Props., LLC*,
  40 A.3d 839 (Del. Ch. 2012) ................................................................... 17

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................. 7

*Delaware Open MRI Radiology Associates v. Kessler*,
  898 A.2d 290 (Del. Ch. 2006) ................................................................. 9

*Dofflemyer v. W.F. Hall Printing Co.*,
  558 F. Supp. 372 (D. Del. 1983) ............................................................. 3

*Exploration & Prod. Co. Stockholder Litig.*,
  No. CIV. A 8090-VCN, 2013 WL 1909124 (Del. Ch. May 9, 2013) ................... 22

*Fradkin v. Ernst*,
  571 F. Supp. 829 (N.D. Ohio 1983) ........................................................ 20

*Gerstle v. Gamble-Skogmo, Inc.*,
  478 F.2d 1281 (2d Cir. 1973) .................................................................. 19

*Gillette Co. v. RB Partners*,
  693 F. Supp. 1266 (D. Mass. 1988) ......................................................... 20

*Gotham Partners, LP v. Hallwood Realty Partners, LP*,
  2000 WL 1476663 (Del. 2000) ................................................................ 28

*Hubka v. Paul Revere Life Ins. Co.*,
  215 F. Supp. 2d 1089 (S.D. Cal. 2002) .................................................... 30

*In re Barboza*,
  545 F.3d 702 (9th Cir. 2008) .................................................................... 8

*In re Encore Energy Partners LP Unitholder Litig.*,
  2012 WL 3792997 (Del. 2012) ................................................................ 15

*In re ExxonMobil Sec. Litig.*,
    500 F.3d, 189 (3d. Cir. 2007)............................................................ 20

*In re John Q. Hammonds Hotels, Inc. Shareholder Litig.*,
    No. 758-CC, 2009 WL 3165613 (Del. Ch. 2009).................................. 18

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F.Supp.2d 1248 (N.D. Cal. 2000) ................................................. 19

*In re Netsmart Techs. S'holders Litig.*,
    924 A.2d 171 (Del. Ch. 2007).............................................................. 22

In re The Walt Disney Co. Deriv. Litig.,
    2004 WL 2050138 (Del. Ch. Sept. 10, 2004) ..................................... 17

*In re Zoran Corp. Derivative Lit.*,
    511 F.Supp.2d 986 (N.D. Cal 2007) .................................................... 18

*Ittella Foods, Inc. v. Zurich Ins. Co.*,
    98 F. App'x 689 (9th Cir. 2004) .......................................................... 29

*Kahn v. Tremont Corp.*,
    694 A.2d 422 (Del. 1997) ................................................................. 8, 9

*Knollenberg v. Harmonic, Inc.*,
    152 Fed. Appx. 674 (9th Cir. 2005) ..................................................... 19

*Lynch v. Vickers Energy Corp.*,
    383 A.2d 278 (Del. 1977) ...........................................................passim

*Malpiede v. Townson*,
    780 A.2d 1075 (Del. 2001) ................................................................. 18

*Miller v. Glenn Miller Prods., Inc.*,
    454 F.3d 975 (9th Cir. 2006)................................................................ 7

*Mills Acquisition Co. v. Macmillan, Inc.*,
    559 A.2d 1261 (1988) ...................................................................... 9, 17

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970) ............................................................................ 4

*Nebel v. Sw. Bancorp., Inc.*,
    CIV. A. 13618, 1999 WL 135259 (Del. Ch. Mar. 9, 1999)..................... 11

*ONTI, Inc. v. Integra Bank*,

751 A.2d 904 (Del. Ch. 1999)............................................................... 10, 11

*Opus Corp. Opus Corp. v. IBM,*
   141 F.3d 1261 (8th Cir. 1998).......................................................... 14

*Osofsky v. Zipf,*
   645 F.2d 107 (2d Cir. 1981)............................................................... 3

*Pauley v. Gilbert,*
   522 S.E.2d 208 (W.Va. 1999)........................................................... 29

*Perzinger v. Carmazzi,,*
   190 W.Va. 693, 691, 442 S.E.2d 646 (W.Va. 1994) ............................. 8

*Peters v. Rivers Edge Mining, Inc.,*
   680 S.E.2d 791 (W.Va. 2009)........................................................... 29

*Plaine v. McCabe,*
   797 F.2d 713 (9th Cir. 1992)........................................................... 2, 7

*Rice v. Hamilton Oil Corp.,*
   658 F. Supp. 446 (D. Colo. 1987)..................................................... 24

*Safeway Stores, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,*
   64 F.3d 1282 (9th Cir. 1995)........................................................... 29

*Stahl v. Gibralter Financial Corp.,*
   967 F.2d 335 (9th Cir. 1992)............................................................. 4

*Starkman v. Marathon Oil Co.,*
   772 F.2d 231 (6th Cir. 1985)........................................................... 23

TSC Industries, Inc. v. Northway,
   426 U.S. 438 (1976) .................................................................... 5, 13

*Umbriac v. Kaiser,*
   467 F. Supp. 548 (D. Nev. 1979)..................................................... 25

*Virginia Bankshares, Inc. v. Sandberg,*
   501 U.S. 1083 (1991)...................................................................... 13

*Weinberger v. Rio Grande Indus., Inc.,*
   519 A.2d 116 (Del. Ch. 1986)............................................................ 5

*Weinberger v. UOP, Inc.,*
   457 A.2d 701 (Del. 1983) .............................................................. 8, 9

*Welch v. Via Christi Health Partners, Inc.*,
   281 Kan. 732 (2006) ........................................................... 17

*Wilson v. Great Am. Indus., Inc.*,
   855 F.2d 987 (2d Cir. 1988) ................................................ 20

*Zirn v. VLI Corp.*,
   681 A.2d 1050 (Del. 1996) .................................................... 5

## <u>Statutes</u>

14 U.S.C. § 781 .................................................................... 2

15 U.S.C. §78n(a) ................................................................ 2

W. Va. Code § 47B-1-3 (2013) ............................................ 12

## <u>Rules</u>

Fed. R. Civ. P. 56(a) ............................................................ 6

## <u>Regulations</u>

17 C.F.R. 240 §14a-9 ........................................................... 2

## <u>Other Authorities</u>

*After Enron: Remembering Loyalty Discourse in Corporate Law*,
   28 Del. J. Corp. L. 27 (2003) ............................................. 17

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

This is a class action brought on behalf of thousands of investors who owned limited partnerships units in one or more of twelve related limited partnerships (collectively, the "Partnerships") formed by defendant Petroleum Development Corporation (now doing business as PDC Energy, Inc.) ("PDC"), which PDC acquired by means of mergers effectuated by the use of virtually identical proxy statements ("proxies") issued to the limited partners.[1] Am. Compl. ¶¶ 1, 14, & 15.[2] Plaintiffs allege the proxies were materially false and misleading and omitted material facts relating to the value of the assets held by the Partnerships. *Id.*, ¶¶ 6, 43-38, & 54-58. Plaintiffs further allege that PDC cashed out the limited partners at grossly unfair prices and enriched PDC at the limited partners' expense. *Id.*, ¶1. By this action, plaintiffs seek damages, restitution, and equitable relief for themselves and the members of the Class. *Id.*, Prayer for Relief.

Defendant PDC is a domestic independent natural gas and crude oil company. PDC owns, operates, and manages oil and natural gas properties located predominantly in Colorado (the Denver-Julesburg (D-J) and Piceance Basins), Texas, and West Virginia. *Id.*, ¶2. Over a period of several years, PDC formed numerous limited partnerships to raise funds to finance the acquisition and development of those properties, and attracted thousands of investors who paid hundreds of millions of dollars for their limited partnership interests. *Id*. After raising these funds from investors, which enabled PDC to acquire and develop these properties, PDC decided to acquire all of the Partnerships' assets for itself.

---

[1] The Partnerships at issue were formed between 2002 and 2005, and were known as the 2002-D Limited Partnership, the 2003-A Limited Partnership, the 2003-B Limited Partnership, the 2003-C Limited Partnership, the 2003-D Limited Partnership, the 2004-A Limited Partnership, the 2004-B Limited Partnership, the 2004-C Limited Partnership, the 2004-D Limited Partnership, the 2005-A Limited Partnership, the 2005-B Limited Partnership, and the Rockies Region Private Limited Partnership.

[2] References to "Am. Compl." are to Plaintiffs' Amended Complaint for Violation of the Federal Securities Laws and Breach of Fiduciary Duty, filed on August 31, 2012.

1

*Id.*, ¶44. To that end, PDC conceived and initiated a scheme to take all the Partnerships private by the end of 2012, to be accomplished by cash out mergers with a single entity, PDC's wholly-owned subsidiary, defendant DP 2004 Merger Sub LLC. *Id.*, ¶2.

Because the Partnerships' limited partnership units were registered with the SEC, pursuant to §12 of the Securities Exchange Act of 1934 (the "1934 Act"), 14 U.S.C. § 78l, PDC was required to solicit the votes of the limited partners to approve the mergers. *Id.*, ¶5. The proxies were thus an "essential link" in the accomplishment of PDC's scheme. *Id.*

Section 14(a) of the 1934 Act, 15 U.S.C. §78n(a), and Rule 14a-9, 17 C.F.R. 240 §14a-9, promulgated by the SEC thereunder, require full and fair disclosure of all material facts for any management-submitted proposals, like the mergers at issue here, that will be subject to a vote of investors. Further, as the sole managing general partner of each of the Partnerships, PDC had a fiduciary duty to deal fairly with the limited partners and a fiduciary duty to fully and fairly disclose to the limited partners all material information known by PDC about the value of the Partnerships' assets. Despite these affirmative obligations, PDC failed to disclose material information about the value of the Partnerships' assets and took advantage of the limited partners so that it could buy their interests at grossly unfair prices.[3]

---

[3] Edwin C. Moritz, plaintiffs' expert on valuation of the Partnerships, has opined that PDC paid the limited partners approximately $109 million for assets with a fair value at the time of the mergers of at least $287 million. Statement of Additional Facts ("AF") AF 5. Moreover, the profits PDC has made on these acquisitions since the time of the mergers, including interest, plus the current value of these assets, is approximately $357 million more than PDC paid the limited partners. *Id.* The fact that PDC obtained assets that are now worth more than $357 million is relevant because Plaintiffs are entitled to disgorgement as a remedy under Section 14(a). *See Plaine v. McCabe*, 797 F.2d 713, 722 (9th Cir. 1992) ("The damages awarded a successful section 14(e) plaintiff, however, may go beyond a determination of a 'fair price.' The purpose of the 1934 Act is to compensate plaintiffs injured by violations of the federal securities laws whether the measure of damages is out-of-pocket loss, benefit of the bargain, or some other appropriate standard.") (citing *Osofsky v. Zipf*, 645 F.2d 107, 111 (2d Cir. 1981); *Dofflemyer v. W.F. Hall Printing Co.*, 558 F. Supp. 372, 380 (D. Del. 1983) ("'[A]ctual damages' may include loss of possible profit, unless wholly speculative, from securing a merger agreement more favorable to plaintiff.")).

Further, under applicable state law, in a going private transaction with a controlling party—such as the mergers at issue in this case—the controlling party, namely, PDC, bears the ultimate burden of proving that the transaction was intrinsically fair to the limited partners. PDC has failed to do so here.

At the time of the merger votes, PDC knew that the Partnerships had valuable rights to drill horizontal wells. Statement of Additional Facts ("AF") AF 20. In fact, PDC identified horizontal drilling locations that included Partnership properties before the mergers at issue took place. AF 25. PDC did not, however, disclose its plan to drill these horizontal wells, nor any of its internal valuations of these drilling opportunities, in the proxies. Rather, the word "horizontal" nowhere appears in any of the proxies. Similarly, PDC virtually ignores this issue in its summary judgment motion, even though the opportunity to drill horizontal wells has been a central issue throughout this case.

As to plaintiffs 14(a) claim, PDC instead argues that the present value discount rates used to value future cash flows were accurately described in the proxies as being based on comparable transactions, that PDC was not required to disclose in the proxies the valuations it had done for its probable and possible reserves, and that the description of the work of the Special Transaction Committee ("Special Committee") of PDC's Board of Directors was accurate.[4]

SEC Rule 14a-9 sets forth disclosure requirements applicable to proxy solicitations. The elements of a claim for violation of §14(a) and Rule 14(a)(9) are much different and easier to plead and prove than a claim for violation of §10(b) and SEC Rule 10b-5. For example, a plaintiff need not prove reliance on the proxy

---

[4] PDC also attempts to resuscitate its argument that any tax benefits received by the limited partners are relevant. Magistrate Judge Nakazato, however, has already ruled that plaintiffs' motivations for investing are not relevant to this case. *See* Doc. Nos. 67, 68, 70 (denying PDC's motion to compel, inter alia, requests for production that sought documents "concerning the Plaintiffs' tax planning objectives" and "the tax benefits they realized from their partnership investments" on the grounds that defendants had "not met their burden of showing the disputed requests seek documents containing non-privileged information that is relevant to a party's claim or defense in accordance with Rule 26(b)(1).").

1   to bring a claim for violation of §14(a) and Rule 14a-9. A plaintiff need only show

2   that the proxy solicitation itself, rather than a particular defect in the solicitation

3   materials, was an "essential link" in the accomplishment of the transaction. *Mills v.*

4   *Electric Auto-Lite Co.*, 396 U.S. 375, 384-85 (1970). A plaintiff similarly need not

5   plead or prove that had adequate disclosures been made, those disclosures would

6   have changed his or her vote. Rather, even a plaintiff who voted against a merger

7   has standing to sue. A plaintiff need only prove that material information was

8   misstated in or omitted from the proxy. Notably, the issue of materiality is rarely

9   susceptible to resolution as a matter of law. *See Stahl v. Gibralter Financial Corp.*

10  967 F.2d 335 (9th Cir. 1992). As explained in *TSC Industries, Inc. v. Northway*:

11      In considering whether summary judgment on the issue [of

12      materiality] is appropriate, we must bear in mind that the underlying

13      objective facts, which will often be free from dispute, are merely the

14      starting point for the ultimate determination of materiality. The

15      determination requires delicate assessments of the inferences a

16      "reasonable shareholder" would draw from a given set of facts and the

17      significant of those inferences to him, and these assessments are

18      peculiarly ones for the trier of fact.

19  426 U.S. 438, 246 (1976) (footnotes and cites omitted) (emphasis added).

20      Applying the foregoing standards, it is plain that the Court cannot conclude,

21  as a matter of law, that the statements made in the proxies about the values of the

22  Partnerships' assets were not misleading. Further, whether the discount rates were

23  commonly used for properties like the Partnerships, as PDC claimed in the proxies,

24  is a disputed issue of fact. Also disputed are the adequacy of the disclosures made

25  about PDC's probable reserves, and the role of Special Committee. AF 1, 2, 13-19.

26      The making of false or misleading statements by a general partner to its

27  limited partners in connection with a proposed merger is also a breach of fiduciary

28  duty. The mergers in question were all self-dealing transactions in which PDC, the

1    sole general partner and controlling person of the Partnerships, acquired the assets

2    of the Partnerships at unfairly low prices. It is well recognized that "in cases

3    involving corporate self-tenders and cash-out mergers that are not contested," such

4    as the mergers in question, and where "as a result, the disclosure to shareholders is

5    normally one-sided," corporate fiduciaries have been required to disclose

6    "information that, although arguably 'soft,' indicated with some degree of

7    reliability that the corporation was worth more than the tender offer or merger

8    price." *Zirn v. VLI Corp.*, 681 A.2d 1050, 1059 n.4 (Del. 1996) (quoting

9    *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 128 (Del. Ch. 1986)).

10           Rather than address its wholesale failure to disclose, PDC's principal

11   argument in support of dismissal of the claim for breach of fiduciary duty is based

12   on the premise that PDC was under no duty to consider alternatives to the merger

13   transaction. That premise is simply incorrect for at least two reasons. First, the

14   critical issue to be decided at trial is whether PDC paid fair value to the limited

15   partners, or was unjustly enriched. That will not require proof that PDC should

16   have entered into any particular alternative transaction. Second, as a fiduciary, PDC

17   did have a duty to consider and pursue alternatives transactions that would have

18   enabled the limited partners to share in the wealth that it expected to create in the

19   near future through the drilling of horizontal wells.

20           As for the duty to consider alternative transactions, imagine if PDC had told

21   the limited partners that they had this choice: agree to the mergers at prices that did

22   not reflect the value of horizontal wells or agree to amend the Partnership

23   agreements to allow the Partnerships to finance for themselves the development of

24   horizontal wells and realize hundreds of millions of dollars in revenues to be shared

25   with PDC? It will be very easy for the jury to conclude what choice the limited

26   partners likely would have made. Of course, when it suited PDC's purposes, it was

27   perfectly able to propose an amendment to the Partnership agreements that was

28   required to enable it to cash out the limited partners. There are numerous other

1   alternatives that PDC could have, but did not, pursue, which were perfectly

2   consistent with the Partnership agreements. AF 3, 9. Moreover, PDC's other

3   arguments, that the Partnerships had no right to drill additional wells and that 11 of

4   the 12 Partnerships could not borrow, are nothing more than red herrings designed

5   to distract the Court from the real issue in this case. That is, that PDC had one plan,

6   to buy out all of its Partnerships, so it would not have to share the upside

7   opportunities with its limited partners. PDC never strayed from this plan and never

8   considered any alternatives that would have been better for the limited partners.

9   Having so acted, it is now PDC's burden—not plaintiffs'—to prove that PDC paid

10  fair value to the limited partners, taking into account the benefits PDC expected to

11  reap from executing on plans it had in place at the time of the mergers.[5]

## II.   <u>LEGAL STANDARD</u>

13      Summary judgment should be granted only if "there is no genuine dispute as

14  to any material fact and the movant is entitled to judgment as a matter of law." FED.

15  R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). As

16  the moving party, and the party with the burden of proof at trial, PDC bears the

17  initial responsibility to point to the absence of evidence of any genuine issue of

18  material fact. *See Celotex Corp.*, 477 U.S. at 323; *see also Miller v. Glenn Miller*

19  *Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). In considering a motion for

20  summary judgment, "[t]he evidence of the non-movant is to be believed, and all

21  justifiable inferences are drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477

22  U.S. 242, 255 (1986); *see also In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008)

---

[5] Another critical point that PDC has overlooked is that PDC needed the affirmative vote of the limited partners to acquire the Partnerships' assets. The limited partners had a blocking position and could have exercised that power to negotiate a better price had they only known what options they really had. This is true under the law of fiduciary duty, as well as under §14. Indeed, this was the point made by the Ninth Circuit in *Plaine v. McCabe*, where the Ninth Circuit held that investors who had been paid a price that had been conclusively adjudicated to be "fair" could nonetheless maintain a claim based on the proposition that they could have negotiated a better price had they only been informed of the facts. 797 F.2d 713, 721-22 (9th Cir. 1986).

("The court must view all the evidence in the light most favorable to the nonmoving party.") (citations omitted).

## III.   ARGUMENT

**A.   PDC Is Not Entitled to Summary Judgment on the Fiduciary Claim.**

As explained by plaintiffs' expert, and as PDC does not contest, these mergers are conflicted freeze-out mergers in which the self-interested controller stood on both sides of the merger transactions. *See Declaration of Davida P. Brook* ("*Brook Decl*")*.*, Ex. 4 [Matthews Report] at 5-6. In such circumstances, the law is clear that PDC, not plaintiffs, must prove that PDC met its fiduciary duty to the limited partners of being disinterested in promoting the deal as fair. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 703 (Del. 1983) (finding that, in a self-dealing transaction, "the ultimate burden of proof is on the majority shareholder to show by a preponderance of the evidence that the transaction is fair"); *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997) (explaining that "[o]rdinarily, in a challenged transaction involving self-dealing by a controlling shareholder, the substantive legal standard is that of entire fairness, with the burden of persuasion resting upon the defendants"); *see also Perzinger v. Carmazzi*, 190 W.Va. 693, 691, 442 S.E.2d 646, 654 (W.Va. 1994) (West Virginia Supreme Court following Delaware's lead in fiduciary duty law, as set forth in *Weinberger*). To do so, PDC must evidence that it satisfied the two-prong test of "entire fairness": fair dealing and fair price. *See Weinberger*, 457 A.2d at 711.[6]

As reiterated more recently in *Kahn*: "The element of 'fair dealing' focuses upon the conduct of the corporate fiduciaries in effectuating the transaction. These concerns include such issues as how the purchase was initiated, negotiated, structured and the manner in which director approval was obtained." 694 A.2d at 430-31 (citing *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280

---

[6] Courts have "historically applied this heightened [fairness] standard to ensure that individuals who purport to act as fiduciaries in the face of conflicting loyalties exercise their authority in light of what is best for all entities." 694 A.2d at 431.

(1988)). Also as explained in *Kahn*, "[t]he price element relates to the economic and financial considerations relied upon when valuing the proposed purchase including: assets, market values, future prospects, earnings, and other factors which effect the intrinsic value of the transaction." *Id.* at 431 (citing *Weinberger*, 457 A.2d at 711). In other words, far from just market value, fair value can include the value of future investments, *see Delaware Open MRI Radiology Associates v. Kessler*, 898 A.2d 290, 316 (Del. Ch. 2006) (finding that plans for opening new MRI facilities that were "clearly part of the operative reality of Delaware Radiology as of the merger date . . . must be valued in the appraisal."); *see also In re Emerging Communications, Inc. Shareholder Litig.*, 2004 WL 13057545, *13 (Del. Ch. May 3, 2004) (finding that a controller's ability to accomplish a cost savings before the merger was an asset of the public company at the merger date and that all shareholders were therefore entitled to share pro rata in that benefit), and usurped opportunities, *see ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 917-18 (Del. Ch. 1999) (including in the definition of fair value the profits from a post-merger transaction when the court found that said transaction was a usurped opportunity).

In the instant case, plaintiffs have adduced evidence demonstrating that PDC has not met its burden as to either prong of this fairness test. As to fair dealing, plaintiffs' expert Gilbert E. Matthews has explained how PDC's Special Committee, far from being independent, was conflicted. *See Brook Decl.*, Ex. 4 [Matthews Report] at 8-10 (explaining how no independent party represented the plaintiff limited partners who were being bought out). Indeed, the proxies themselves concede that the Special Committee, which was composed entirely of members of PDC's Board of Directors, was conflicted as, on the one hand, they were supposed to represent the limited partners, and, on the other hand, they owed fiduciary duties to PDC's shareholders to pay the least amount possible to the limited partners:

[T]he members of the board of directors of PDC have a duty to cause

1    PDC to manage the partnership in the best interests of the limited

2    partners of the partnership. However, members of the board of

3    directors of PDC also have a duty to operate PDC's business for the

4    benefit of its shareholders . . . . Consequently, the duties of the

5    members of the board of directors of PDC to the investors may conflict

6    with the duties of those members to PDC and PDC's shareholders.

7    *Brook Decl.*, Ex. 7 [2004-D Proxy Statement] at 36-7.

8         The evidence also shows the Special Committee did not ask for independent

9    financial advice to assist in negotiations nor to consider alternative courses of

10   action. *See* AF 1. Rather, the financial advisor retained by the Special Committee—

11   Houlihan Lokey—explicitly removed itself from any obligation to engage in any of

12   these causes of action. *See id.*

13        PDC also does not, and indeed cannot, contest that, despite its extensive

14   knowledge of valuable horizontal drilling opportunities, it chose not to disclose

15   these opportunities to the limited partners. To the contrary, PDC was only

16   interested in how it could put the most money in its own pockets, irrespective of

17   whatever duties it owed the limited partners. *See Brook Decl.*, Ex. 8 [MS 0026756]

18   at 8 (explaining that "[s]ervice business model raises capital, but gives away upside

19   associated with ownership of valuable reserves with extensive drilling

20   opportunities.").

21        As to fair price, regardless of whether or not the Partnerships had a right to

22   drill horizontal wells (and clearly they did, based on the Partnerships agreements

23   and PDC's own admissions), PDC still underpaid for the Partnerships' assets. As a

24   fiduciary, PDC had a duty to pay a fair price to the limited partners that reflected

25   the true underlying value of the Partnerships if it wished to acquire the

26   Partnerships' assets for itself. Plainly, there are issues of material fact as to whether

27   PDC paid the limited partners "fair value" for their assets. *See Nebel v. Sw.*

28   *Bancorp., Inc.*, CIV. A. 13618, 1999 WL 135259 (Del. Ch. Mar. 9, 1999) (denying

9

1    summary judgment because a jury could determine that "fair value" was not paid).

2    In fact, whether the partners were paid fair value is a hotly contested issue over

3    which there are many disputed issues of fact. Plaintiffs' experts, Edwin C. Moritz

4    and Gilbert E. Matthews, explain why PDC's purchase price for the Partnerships

5    did not reflect the fair value of the Partnerships' assets. AF 5. For example, Mr.

6    Matthews cited evidence demonstrating that PDC knew of the potential for

7    horizontal drilling, for refracturing of existing wells, and for newly available infill

8    wells on the Partnerships' leaseholds; and demonstrated that by not taken these

9    wells into account, PDC failed to pay fair value of these opportunities. AF 5, 7.

10   Other evidence will permit the jury to find that PDC did not pay fair value to the

11   limited partners. *Id.*

12       The Delaware Supreme Court's decision in *Lynch v. Vickers Energy Corp.*,

13   383 A.2d 278 (Del. 1977), is instructive here. In that case, Vickers Energy owned

14   53.5% of the shares of TransOcean Oil and launched a tender offer for the

15   remaining shares of TransOcean at $12 per share. Like PDC, Vickers was the

16   controlling person of TransOcean and therefore owed fiduciary duties to the other

17   stockholders "which required 'complete candor' in disclosing fully 'all of the facts

18   and circumstances surrounding the' tender offer." 383 A.2d at 279. Like the

19   partnerships here, TransOcean was in the oil and gas business. In its tender offer

20   materials, Vickers said the aggregate net discounted value of TransOcean's proved,

21   probable and possible reserves was "not less than $200,000,000 (approximately

22   $16.00 per share) and could be substantially greater." *Id.* at 280. Vickers, however,

23   had another estimate prepared by a petroleum engineer working for TransOcean,

24   that had put the net asset value at $250.8 million (approximately $20.00 per share),

25   and from which one could conclude that the value was as high as $300 million. The

26   trial court entered judgment for Vickers, finding that the second report did not need

27   to be disclosed because there were reasons why it could be doubted and because

28   Vickers had disclosed that the values of the reserves "could be substantially

greater" than $200,000,000. The Delaware Supreme Court reversed, applying the *TSC Industries, Inc. v. Northway* standard of materiality, holding that "Defendants concede that they owed plaintiff a fiduciary duty of complete frankness but assert that they discharged that duty by accurately disclosing that TransOcean's net asset value was 'not less than $200,000,000 . . . and could be substantially greater.' Technically speaking, the language may be accurate; but that kind of generality is hardly a substitute for hard facts when the law requires complete candor." 383 A.2d at 281-82.

Like Vickers, PDC failed to disclose its internal valuations, which placed a much higher value on the Partnerships' assets. AF 13, 17, 18. Moreover, in light of these internal valuations PDC, as the general partner of the Partnerships, knew that the values it ascribed to the Partnerships' assets in the proxies materially undervalued those assets. *See also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098, 111 S. Ct. 2749, 2761, 115 L. Ed. 2d 929 (1991) ("And although the proxy statement did speak factually about the merger price in describing it as higher than share prices in recent sales, it failed even to mention the closed market dominated by FABI. None of these disclosures that the directors point to was, then, anything more than a half-truth, and the record shows that another fact statement they invoke was arguably even worse.").

1.   **PDC's Arguments Are Unavailing.**

    a.   **Under West Virginia Law, PDC Owed Plaintiffs Traditional Fiduciary Duties of Due Care and Loyalty.**

PDC does not contest that it owed fiduciary duties to plaintiffs and the members of the Class. PDC, however, attempts to muddy the waters by arguing that, under the West Virginia Revised Uniform Partnership Act, the Partnership agreements could have limited PDC's fiduciary duties.

As an initial matter, and as PDC has itself acknowledged, under West Virginia law, the parties cannot "[e]liminate the duty of loyalty[,]" "[u]nreasonably

reduce the duty of care[,] or "[e]liminate the obligation of good faith and fair dealing." W. Va. Code § 47B-1-3 (2013) ("Effect of partnership agreement; nonwaivable provisions."); *see also* PDC's Mot. at 12 (explaining that "the partnership agreement cannot eliminate the duty of loyalty provided for in Section 47B-4-4(b) and cannot unreasonably reduce the duty of care under Section 47B-4-4-(c)").

Here, the Partnership agreements did not even purport to limit PDC's fiduciary duties. Moreover, the Partnership agreements expressly acknowledge the broad scope of PDC's responsibilities.[7] *See* Doc. No. # 74-9 [Partnership Agreement at §5.02(o)] (providing: "The Managing General Partner shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in the Managing General Partner's possession or control, and shall not employ or permit another to employ such funds or assets in any manner except for the exclusive benefit of the Partnership."); *see also id*. at §5.07(e) ("Neither the Managing General Partner nor its Affiliates shall profit by drilling in contravention of its fiduciary obligations to the Partnership."). Similarly, the Prospectuses advised the limited partners that PDC owed the highest fiduciary duties to the limited partners. *See Brook Decl.*, Ex. 12 at 58, Ex. 13 at 57.

This case is thus unlike cases where courts have recognized the enforceability of a contractual limitations of a general partner's fiduciary duties. *Cf. In re Encore Energy Partners LP Unitholder Litig.* 2012 WL 3792997, at *13 (Del.

---

[7] As stated in *Opus Corp. v. IBM* (the only case PDC cites that addresses the provision of RUPA allowing for the imposition of reasonable limits on a partner's fiduciary duty of due care), the contractual limitations contemplated by Section 47B-1-3 must (1) have been included in the partnership agreement; and (2) relate to a partner's fiduciary duties—as compared to just the business of a partnership. *See Opus Corp.*, 141 F.3d 1261 (8th Cir. 1998), (finding no breach of fiduciary duty where two "very sophisticated companies" engaged in over a year's worth of "equally sophisticated negotiations and lawyers to help them agree on each of the many questions raised by the formation of the partnership and the related business ventures[,]" and, as part of these discussions, "agreed that IBM would have no liability to Opus for mistakes in judgment unless IBM intentionally violated the agreement, was 'grossly negligent,' or engaged in 'willful neglect[,]'" and there was no evidence of any such action.)

2012) (recognizing that the partnership agreement "expressly and unambiguously waived common law fiduciary duties" where it stated: "Except as expressly set forth in this Agreement, neither the General Partner nor any other Indemnities shall have any duties or liabilities, including fiduciary duties, to the Partnership").

### b.   PDC's Other Arguments Are Likewise Unavailing.

First, PDC claims that it had no right or duty to drill any new wells after the first well was drilled in the first year of the life of a partnership. However, the Partnership agreements expressly provided that new wells could be drilled, completed and operated on existing Partnership prospects. AF 26 (Partnership Agreement at §6.03) (providing that the General Partner could apply Partnership revenues towards other Partnership operations "including without limitation for the purposes of drilling, completing, maintaining, recompleting, and operating wells on existing Partnership Prospects").[8] PDC ignores this critical language.

Second, PDC claims that the prices it paid were fair because, except for one Partnership, the Partnerships could not borrow money to drill horizontal wells. This argument fails for at least the following reasons. Plaintiffs' experts have explained that there were many ways for the Partnerships to fund the development of horizontal wells, including selling assets (as PDC did to fund its own horizontal drilling), retaining earnings, or entering into joint ventures or farm-out arrangements, all of which are common in the oil and gas industry. AF 2. PDC's own employees testified that the Partnerships did not need to borrow or raise new funds in order to engage in the refracturing of wells, or even to drill horizontal

---

[8]   Moreover, to the extent three is any ambiguity as to what the Partnership documents provide, that ambiguity should be resolved in favor of the limited partners. *See Gotham Partners, LP v. Hallwood Realty Partners, LP*, 2000 WL 1476663, at *8 (Del. 2000) ("Where a limited partnership agreement was drafted exclusively by the general partner, the court will interpret ambiguities against the drafter, rather than examine extrinsic evidence. But if a limited partnership agreement was the product of negotiations among the parties, the court will resolve an ambiguity by examining relevant extrinsic evidence."). Here, it is undisputed that there were no negotiations over the terms of the Partnership agreements.

1    wells. AF 11. As Mr. Shuss explained, the Partnerships could do just what PDC has

2    itself done, which is enter into pooling arrangements whereby they would have paid

3    for only a fraction of the wells. AF 10. Moreover, if PDC could and did seek

4    amendment to the Partnership agreements—something PDC had to do to enable the

5    cash-out mergers to take place—PDC could just as easily have explained to the

6    limited partners why an amendment to allow borrowing would be very much in

7    their interest. Finally, as to the Rockies Region Private Limited Partnership, PDC

8    has failed to explain why it did not explore borrowing with that Partnership, which

9    PDC admits was permitted to borrow under its existing Partnership agreement.

10   *Brook Decl.*, Ex. 17 [PDC00742887-976 at 945].

11         <u>Third</u>, PDC claims it had no duty to negotiate with third parties about

12   hypothetical transactions. PDC misses the point. PDC's failure to seriously consider

13   and pursue such transactions—because it wanted to acquire the Partnerships' assets

14   for itself—is a breach of its duty of loyalty. PDC's argument that another party

15   would be unwilling to pay substantial value for the partnerships' horizontal well

16   opportunities is also wide of the mark. PDC paid the limited partners nothing for

17   the horizontal well opportunities PDC usurped. Certainly, PDC could have obtained

18   more than that from a third party. PDC had at least one offer from a third party to

19   invest $200 million in horizontal Niobrara opportunities, which PDC turned down

20   because it did not want to share these opportunities with any business partner. AF 2.

21   PDC made no attempt to explore that opportunity, or any similar opportunity, on

22   behalf of the Partnerships.[9]

23   _____

24   [9] Such failure to affirmatively investigate alternatives to the merger transaction was
     a clear breach of its fiduciary duties. *See, e.g., Auriga Capital Corp. v. Gatz Props.*,
     LLC, 40 A.3d 839 (Del. Ch. 2012) (finding that a managing member breached its
25   fiduciary duties by failing to thoughtfully consider alternatives to an auction that
     might have benefited the limited liability company's members); *see also Mills
26   Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) (explaining
     that principles of fiduciary duty "demand that corporate fiduciaries … affirmatively
27   protect and defend those interests entrusted to them" and that "[o]fficers and
     directors must exert all reasonable and lawful efforts to ensure that the corporation
28   is not deprived of any advantage to which it is entitled"); *In re The Walt Disney Co.
     Deriv. Litig.*, 2004 WL 2050138, at *5 n.49 (Del. Ch. Sept. 10, 2004) (noting that

**B.     DP 2004 Merger Sub, LLC is Liable for Breach of Fiduciary Duty.**

Plaintiffs' claim against DP Merger Sub is for aiding and abetting PDC's breach of fiduciary duty. To prevail on an aiding and abetting claim, a plaintiff must establish "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del. 2001) (internal quote omitted). As is reflected in all of PDC's SEC filings, DP 2004 Merger Sub, LLC was inextricably intertwined with PDC's scheme and knew that its conduct was assisting PDC's breach. AF 12. As just one example, PDC recognized DP Merger Sub's involvement by remarking that it needed DP Merger Sub to effectuate the mergers. *Id.* Thus, summary judgment is improper. *See In re John Q. Hammonds Hotels, Inc. Shareholder Litig.*, No. 758-CC, 2009 WL 3165613, *18 (Del. Ch. 2009) (finding summary judgment improper in defendants' motion against a merger subsidiary for aiding and abetting theory).

**C.     Scienter is Not an Element of a Section 14(a) Claim**

PDC argues that because the Supreme Court has twice reserved decision on whether scienter must be proved as an element of a Section 14(a) claim "this Court can decide the issue now and conclude that scienter is required and is not present here." PDC *Mot.* at 3. However, the great weight of authority, including the authority in this circuit, is that the required state of mind required for a §14(a) claim is negligence. *In re Zoran Corp. Derivative Lit.,* 511 F.Supp.2d 986, 1015 (N.D.

---

(… cont'd)

the "duty of loyalty … imposes an affirmative obligation to protect and advance the interests of the corporation") (citation omitted); Lyman Johnson, After Enron: Remembering Loyalty Discourse in Corporate Law, 28 Del. J. Corp. L. 27, 40 (2003) (discussing the duty of loyalty's demand of "devotion," i.e., the fiduciary obligation to affirmatively protect corporate interests); *see also Welch v. Via Christi Health Partners, Inc.,* 281 Kan. 732 (2006) (acknowledging only that while the Kansas Uniform Partnership Act authorizes a partner to pursue his or her own interests, the Act does not authorize a partner to pursue his or her own interests without regard to the partnerships and other partners).

Cal 2007) ("a state of mind of negligence will suffice as to the degree of culpability"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1267 (N.D. Cal. 2000) ("Defendants argue that the appropriate standard of culpability under Rule 14a–9 is scienter, while Lead Plaintiff argues for a lower negligence standard. Lead Plaintiff's position is correct . . . Indeed, with respect to defendants who directly solicited proxies, it appears that no reported opinion requires a plaintiff to plead or prove scienter."); *see also Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674, 683 (9th Cir. 2005) ("However, unlike Section 10(b), Section 14(a) lacks any reference to a 'manipulative device or contrivance . . . to indicate a requirement of scienter. Accordingly, negligence is sufficient to support a claim for a violation of Section 14(a) for both forward looking and non-forward looking statements") (internal cites omitted).[10]

Courts around the country hold that for liability to attach under § 14(a), all that is required is that a proxy be false or misleading with respect to any material fact. *In re ExxonMobil Sec. Litig.,* 500 F.3d, 189, 196-7 (3d. Cir. 2007) ("violations of § 14(a), on the other hand, may be committed without scienter; in other words, no culpable intent is required"); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988) ("Under Rule 14a-9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive."); *accord Gillette Co. v. RB Partners*, 693 F. Supp. 1266 (D. Mass. 1988); *Fradkin v. Ernst*, 571 F. Supp. 829, 843 (N.D. Ohio 1983). In any event, Plaintiffs have evidence of scienter. AF 8.

---

[10] Indeed, the reason courts refuse to read a scienter requirement beyond negligence into §14(a) is because, unlike §10(b), which prohibits the use of a "manipulative or deceptive device or contrivance", the "scope of the rulemaking authority granted under section 14(a) is broad, extending to all proxy regulation 'necessary or appropriate in the public interest or for the protection of investors' and not limited by any words connoting fraud or deception." *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1299 (2d Cir. 1973) (Friendly, J.) ("a reading of Rule 14a-9 as imposing liability without scienter in a case like the present is completely compatible with the statutory scheme."). *See also ExxonMobil,* at 196-97.

**D.**     **PDC Is Not Entitled to Partial Summary Judgment on the §14a Claim.**

PDC offers three primary arguments regarding plaintiffs' Section 14(a) claim. These arguments deal with: (1) statements in the proxies regarding present value discount rates, (2) disclosures of probable and possible reserves, and (3) the role of the Special Committee. There are, however, many genuine issues of material fact that preclude summary judgment with regard to each of these issues.

    **1.**     **Net Present Value Discount Rates.**

PDC's statements about its use of 15% and 25% discount rates were misleading because, contrary to PDC's statements that these rates reflected similar transactions, they varied significantly from PDC's own internal calculations of the appropriate discount rate to be used in measuring the Partnerships' reserves. AF 13. PDC's internal valuations are of course material because investors would want to know management's internal valuation figures. *Brown v. Brewer*, 2010 WL 2472182 at (C.D. Cal, June 16, 2010) ("A reasonable shareholder would have wanted to independently evaluate management's internal financial projections to see if the company was being fairly valued . . . if a proxy discloses valuation information, it must be complete and accurate") (internal quotes and cites omitted).

Second, as noted above, the disclosures relating to discount rates are inaccurate because PDC did not use the discount rates of 15% and 25% when it evaluated comparable transactions. AF 14. There is evidence showing that PDC evaluated an acquisition transaction involving Merit Energy in October 2011 by applying a discount rate of 9%, not 15%, to proved developed producing ("PDP") reserves and 12%, not 25%, to PDNP reserves. *Id*. PDC had likewise previously evaluated this transaction in September 2010 using discount rates of approximately 10% for PDP reserves and 17.5% for PDNP reserves. *Id.* PDC similarly used a 10% discount rate when evaluating the potential purchase of assets from Suncor. *Id.*

Third, PDC's internal corporate bonus calculations, prepared by its Vice President of Acquisitions, Lance Lauck, show that PDC believed the appropriate

discount rate to be 10%, not 15% or 25%. AF 13, 16. Specifically, when determining the amount that Mr. Lauck and other PDC employees on PDC's "Partnership Acquisition Team," should be paid as bonuses (for acquiring the Partnerships at the prices that were paid to the limited partners), Mr. Lauck indicated that the "market value" of the partnerships should be measured using a 10% discount rate, referred to as "PV10." *Id.* This document indicates that PDC obtained $43 million of "economic value added above the purchase price," based on the cash-out mergers of 8 of the 12 Partnerships at issue in this case. *Id*. This was accomplished simply by using 15% and 25% discount rates to calculate the net present value of the partnership assets (instead of the "market value" discount rate of 10%). *Id.* By contrast, PDC has not identified any documents showing that it used 15% and 25% discount rates for valuing PDP and PDNP properties similar to the Partnership properties at issue, nor has PDC established that the discount rates of 15% and 25% are commonly used in the oil and gas industry for the acquisition of proved developed producing reserves and proved developed non-producing reserves like the ones at issue in this case. AF 15. Because there are—at a minimum—three hotly disputed issues of fact relating to whether PDC's disclosure of discount rates was misleading, summary judgment is improper.[11]

### 2. **Probable and Possible Reserves.**

PDC next argues that because the SEC only permitted and does not require disclosure of probable and possible reserves in financial statements filed with the SEC, PDC's non-disclosure of probable and possible reserves to the limited

---

[11] PDC's case law on discount rates is inapposite. *In re Plains Exploration & Prod. Co. Stockholder Litig.*, suggests only that investors can judge the appropriateness of a discount rate. No. CIV. A 8090-VCN, 2013 WL 1909124 (Del. Ch. May 9, 2013), This does not mean that a company's internal valuations of discount rates are not material. *See In re Netsmart Techs. S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007) ( "[P]rojections of this sort are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or ... market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects.").

partners in the proxies was appropriate. However, those regulations have no bearing on the requirement that a proxy issued in connection with a merger not make a material misrepresentations or omissions. Rather, PDC's lack of candor is actionable because PDC knew the value of those reserves and failed to disclose this information to the limited partners. In a similar case, *Lynch v. Vickers*, the Court recognized that the failure to make such disclosures was actionable. *See Lynch v. Vickers Energy Corp.*, 383 A.2d 278 (Del. 1977) (finding that, when Vickers claimed that its proved, probable, and possible reserves were "not less than $200,000" and "could be substantially greater," and the engineer had estimated the net asset value at $250.8 million, its statement was actionable because Vickers did not disclose internal valuations).

Like Vickers, PDC failed to disclose the value of the Partnerships' probable and possible reserves in the proxies even though regularly touted the value of its own probable and possible reserves internally and to analysts. AF 19.[12]

Additionally, PDC's argument is factually flawed because the proxies all include the values of certain non-proven reserves and misrepresent those values. Each proxy included the following statements regarding non-proven (i.e., probable and possible) reserves:

- "Non-proven undeveloped projects were valued at $10,000 per drilling location." AF 6.

- "PDC calculated the volumes of the partnership's proved reserves as of May 1, 2010 based on a future production curve consistent with the production curves used in the partnership's proved reserve report as of December 31, 2009, <u>with the addition of estimated reserves attributable to non-proven</u>

---

[12] Further, PDC's citation to *Starkman v. Marathon Oil Co.* is not persuasive, as the *Starkman* court specifically recognized that there is a "special context of freeze-out mergers" that requires disclosure of appraisals, as compared with the first-stage tender offer at issue in *Starkman*.  *See Starkman v. Marathon Oil Co.*, 772 F.2d 231, 240-41 (6th Cir. 1985).  As this case involves a freeze-out merger, *Starkman* is inapplicable.  Nor does Rule 10b-5 apply to this case.

<u>recompletion and drilling projects not included in the partnership's proved reserve report.</u>" AF 6.

Even if PDC position is credited that disclosure of non-proven reserves is not required by SEC rules, once a statement of those values is disclosed, the proxy cannot misrepresent the value of those reserves. *See Lynch,* 383 A.2d at 278 (finding that defendant's disclosure pertaining to proved, probable, and possible reserves was inadequate where defendant had another estimate prepared by a petroleum engineer that estimated a higher net value). This is especially true where PDC's internal valuations show that it acknowledged the significant value attributable to its proved, probable and possible reserves, which it did not adequately disclose to the limited partners. AF 19, 22, 23.[13]

### 3.   Special Committee.

Finally, there are disputed issues of material fact with regard to PDC's disclosures pertaining to the Special Committee. The parties dispute whether the Special Committee seriously considered alternative transactions, and whether the Partnerships could have financed alternative transactions. With regard to the former, though PDC claims that the Special Committee considered alternative transactions, there is ample evidence to suggest otherwise. Plaintiffs' expert, Edwin C. Moritz, opined that PDC "ignored alternative options to the merger . . . with the . . . result of shortchanging the limited partners." AF 1. Jeffrey Swoveland, chairman of the Special Committee, testified that the Special Committee was "aware of" alternatives, but was not "focused" on them because they were considered a "moot point" by the time the Special Committee reviewed the merger transactions. *Id.* Similarly, James Hanson, an employee of Houlihan Lokey, the

---

[13] *Rice v. Hamilton Oil Corp.*, 658 F. Supp. 446 (D. Colo. 1987) actually supports Plaintiffs' position, as it acknowledges the requirement to disclose appraisals, estimates, and forecasts, if the estimates will increase "proved" reserves. Here, PDC acknowledged that it expected its number of "proved" reserves in the Wattenberg Field to continue to grow. *See Brook Decl.*, Ex. 33 PDC00727207-297, at PDC00727231 (showing 20% increase in proved reserves on a yearly basis).

firm that conducted the fairness review for PDC and the Special Committee, admitted that Houlihan Lokey did not look at the merits of any other alternative transactions. *Id.* PDC does not cite any evidence showing that the Special Committee actually considered alternatives, citing only the proxies in support of this proposition.[14] AF 1, 4.

Accordingly, there are genuine issues of disputed fact with regard to all aspects of plaintiffs' §14(a) claim addressed in PDC's Motion.[15]

## E.    The Scope of Plaintiffs' Assignment Cannot be Resolved on Summary Judgment

PDC contends that the Court should summarily rule that the Partnerships owned only the right to receive production from certain wellbores, which PDC refers to as a "wellbore interest," as opposed to owning leasehold interests in acreage spacing units as specified by the Partnership agreements and other related documents. PDC supports its position with a single document for which PDC was on both sides of the transaction—an assignment from PDC to a Partnership, of which PDC was itself the general partner. This wellbore assignment was not part of the offering documents and does not appear to have been disclosed to the limited partners until <u>after</u> PDC decided to buy-back the limited partnerships.

PDC's "wellbore" position is directly contrary to the Partnership agreements, the original prospectuses, and the drilling and operating agreements incorporated therein. All of these documents indicate that PDC was required to sell a "Prospect" to the Partnerships, consisting of a "geographically defined" area, which was further defined as a spacing unit containing "approximately 32 acres." AF 20 (citing Doc. No. 74-9 [Partnership Agreement at A-8, §1.08(tt) ("In general, a Prospect is an

---

[14] If PDC's position is that the Special Committee can satisfy its duty to consider alternatives to the cash-out mergers by simply stating and summarily dismissing a few alternatives, that position is untenable.

[15] *Umbriac v. Kaiser*, 467 F. Supp. 548 (D. Nev. 1979) and *Allen v. Penn Cent. Co.*, 350 F. Supp. 697 (E.D. Pa. 1972) are inapposite because here, there is evidence that PDC told the Special Transaction committee that various plausible alternatives were a "moot point." *Swoveland Depo. Tr.* at. 191:21 – 192:13.

1   area in which the Partnership owns or intends to own one or more oil and gas

2   interests, which is geographically defined on the basis of geological data by the

3   Managing General Partner . . .")]; *Brook Decl.*, Ex. 12 [2004-2006 Drilling Program

4   Prospectus] at 37, A-7 ("For this reason the partnerships are expected to acquire

5   spacing units on each prospect determined by state rules and regulations in

6   conjunction with local practice.  The spacing unit for Colorado wells will

7   encompass approximately 32 acres for wells drilled in the Wattenberg Field . . .”);

8   Doc. No. 78-9 [D&O Agreement] at 1 (The term “Prospect” shall mean a spacing

9   unit established according to state regulatory guidelines and industry practice on

10  which the Partnership proposes to drill a well. Generally, the spacing unit for

11  Colorado wells will encompass approximately 32 acres for wells drilled in the

12  Wattenberg Filed and approximately 20 acres for wells drilled in the grand Valley

13  Field.”)]). Accordingly, there can be no question that, according to the Partnership

14  agreements and Partnership documents, the limited partners were to be given more

15  than just an interest in production from certain wellbores. *See also Edwards Depo.*

16  *Tr.* at 29:7-11; 30:23-31:2 (admitting that a wellbore interest, as PDC defines it, is

17  not equivalent to a spacing unit in a certain number of acres).

18       Not surprisingly therefore, PDC has itself consistently referred to the

19  Partnerships’ ownership in terms of acreage. For example, PDC’s 10-K filings

20  explain: “The Partnership’s properties consist of oil and gas wells, associated well

21  equipment, and the ownership in leasehold acreage assigned to the spacing units on

22  which the 49 wells were drilled.” *See* AF 20 (emphasis added). Similarly, PDC’s

23  Form 10 filings provide:

24       PDC holds record title in its name to leases, spacing units or portions

25       of leases/units as described above. PDC will assign its interest in the

26       lease to the Partnership. Leases acquired by the Partnership will

27       initially and temporarily be held in PDC’s name, as nominee, to

28       facilitate joint-owner operations and the acquisition of properties.

22

1        <u>Unrecorded assignments from PDC, the current record owner, will</u>

2        <u>indicate that the leases are being held for the benefit of the</u>

3        <u>Partnership.</u>

4 AF 20 (emphasis added).

5        Relatedly, if the Partnerships owned only production from "wellbores," as

6 PDC claims, then the Partnerships would not own any undrilled locations. PDC

7 admitted, however, at the time of the cash-out mergers that the partnerships owned

8 undrilled locations. *See e.g., Brook Decl.*, Ex. 7 [2004-D Proxy] at 18 ("PDC

9 believes that having the partnership's assets under its direct control will enable

10 PDC to realize operational benefits and cost synergies, including, among others,

11 immediate access to the partnership's reserves <u>and undrilled locations</u> . . . .")

12 (Emphasis added). Lest there be any doubt, PDC specifically valued the

13 Partnerships' undrilled locations at $10,000 each and paid the limited partners for

14 those assets of the Partnerships, though at a grossly unfair and underderstated

15 amount. *Id.* at 51-52. ("[u]ndeveloped reserves were valued at $10,000 per drilling

16 location because these wells are down spacing projects to 20 acres . . ." and "Non-

17 proven undeveloped projects were valued at $10,000 per drilling location."). Of

18 course, if the Partnerships owned the rights to these undrilled locations, then the

19 Partnerships owned more than just an interest in the oil and gas produced from

20 particular wellbores.

21        The Partnership agreements demonstrate in other places that when PDC sells

22 or assigns a lease to the Partnerships, it must assign a proportional interest in the

23 lease that PDC holds, not merely an interest in a wellbore. *See* Doc. No. 74-9

24 [Partnership Agreement] at A-22, §5.07(a) ("Whenever the Managing General

25 Partner or its Affiliates sell, transfer, or assign an interest in a Prospect to the

26 Partnership, they shall assign to the Partnership an equal proportionate interest in

27 each of the Leases comprising the Prospect.").

28

Further, PDC's internal documents recognize that the Partnerships' ownership interests were not clear as PDC now claims. *See Brook Decl.*, Ex. 41 [PDC00681978] (April 2010 memo from PDC's "Executive Leadership Team" to its Board of Directors explaining that "it is not clear that the partnerships legally own such drilling locations [referring to potential drilling locations]"). Since PDC was the sole negotiator and drafter, any ambiguity should be resolved in favor of the limited partners. *See Gotham Partners, LP v. Hallwood Realty Partners, LP*, 2000 WL 1476663, at *8 (Del. 2000) ("Where a limited partnership agreement was drafted exclusively by the general partner, the court will interpret ambiguities against the drafter, rather than examine extrinsic evidence. But if a limited partnership agreement was the product of negotiations among the parties, the court will resolve an ambiguity by examining relevant extrinsic evidence.").

In addition to the documentary evidence that the partnerships owned more than wellbore interests, PDC witnesses testified that within PDC there was considerable disagreement over what interests the Partnerships owned. For example, PDC's Darwin Stump testified that PDC executives discussed whether the Partnerships owned more than wellbore interests and determined, by consensus, that PDC had to compensate the limited partners for undrilled locations**.** AF 21. PDC's Celesta Miracle and Lance Lauck similarly acknowledged that it was unclear what the Partnerships owned. *Id.*

The assignments at issue are far from clear and should not be interpreted in a way that would cause them to controvert the clear language of the Partnership agreements or the prospectuses. In making their argument, Defendants completely ignore the contrary language in the partnership agreements, the prospectuses and the drilling and operating agreements. And PDC cites no cases in support of its wellbore argument, further demonstrating that this is—on PDC's best day—a fact issue for the jury.

**F.**     **The Jury Could Appropriately Find that Plaintiffs are Entitled to Punitive Damages**

Punitive damages are available for breach of fiduciary duty under West Virginia law. *See Pauley v. Gilbert*, 522 S.E.2d 208, 217 (W.Va. 1999) (holding that defendant's conduct in "... failing to perform her legally-prescribed fiduciary duties and in misappropriating the corpus of [plaintiff's] trust account for [defendant's] own use constituted 'bad faith, vexatious[], wanton[] [and] . . . oppressive' behavior" meriting an award of exemplary damages).. In order for punitive damages to be awarded, the plaintiff need show only that the defendant acted "wantonly, willfully, or maliciously." *Peters v. Rivers Edge Mining, Inc.*, 680 S.E.2d 791, 818 (W.Va. 2009). Here, the jury could conclude that PDC acted wantonly or willfully by concocting a scheme to permit PDC to realize the financial benefits of horizontal drilling opportunities at the expense of the limited partners, in breach of its fiduciary duty to them. AF 24. Particularly in light of the way in which PDC kept horizontal drilling opportunities secret from the limited partners, and wasted no time in seeking to drill the horizontal wells after it acquired the Partnerships' assets, punitive damages may be in appropriate. *Id.*[16]

**IV.**     **CONCLUSION**

Thus, for the foregoing reasons and authorities, plaintiffs respectfully submit that defendants' motion for summary judgment and partial summary judgment should be denied.

---

[16] *Ittella Foods, Inc. v. Zurich Ins. Co.*, 98 F. App'x 689 (9th Cir. 2004) and *Safeway Stores, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 64 F.3d 1282 (9th Cir. 1995) both deal with an insurance companies that denied coverage in bad faith, and have no bearing on this litigation. Similarly, *Hubka v. Paul Revere Life Ins. Co.*, 215 F. Supp. 2d 1089 (S.D. Cal. 2002) deals with insurance defense, and recognized that it is appropriate to deny summary judgment where the court finds that a reasonable juror could conclude by clear and convincing evidence that an insurer acted in bad faith with "conscious disregard" of another's rights, as PDC did here.

1  Dated:  April 7, 2014                    MARC M. SELTZER
                                            DAVIDA P. BROOK
2                                           KRYSTA KAUBLE
                                            SUSMAN GODFREY L.L.P.
3
                                            WILLIAM R.H. MERRILL (*Pro Hac Vice*)
4                                           bmerrill@susmangodfrey.com
                                            JAMES T. SOUTHWICK *(Pro Hac Vice)*
5                                           jsouthwick@susmangodfrey.com
                                            SUSMAN GODFREY L.L.P.
6                                           1000 Louisiana Street, Suite 5100
                                            Houston, TX  77002-5096
7                                           Telephone:  (713) 651-9366
                                            Fax:  (713) 654-6666
8
                                            THOMAS G. FOLEY
9                                           ROBERT A. CURTIS
                                            JUSTIN P. KARCZAG
10                                          FOLEY BEZEK BEHLE & CURTIS LLP

11                                          JOHN A. STILLMAN (43731)
                                            jstillman@goodwildman.com
12                                          GOOD WILDMAN HEGNESS
                                            & WALLEY
13                                          5000 Campus Drive
                                            Newport Beach, CA  92660
14                                          Telephone:  (949) 955-1100
                                            Fax:  (949) 833-0633
15
                                            By /s/ Marc M. Seltzer
16                                                Marc M. Seltzer
                                                  Attorneys for Plaintiffs
17

18

19

20

21

22

23

24

25

26

27

28

26

**Patsy Goff**

| | |
|---|---|
| **From:** | cacd_ecfmail@cacd.uscourts.gov |
| **Sent:** | Tuesday, April 08, 2014 2:18 AM |
| **To:** | ecfnef@cacd.uscourts.gov |
| **Subject:** | Activity in Case 8:11-cv-01891-AG-AN Jeffrey Schulein et al v. Petroleum Development Corporation et al Objection/Opposition (Motion related) |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA**

**Notice of Electronic Filing**

The following transaction was entered by Seltzer, Marc on 4/8/2014 at 0:17 AM PDT and filed on 4/7/2014

| | |
|---|---|
| **Case Name:** | Jeffrey Schulein et al v. Petroleum Development Corporation et al |
| **Case Number:** | 8:11-cv-01891-AG-AN |
| **Filer:** | Jane S Barr |
| | Robert H Barr |
| | Christine L Cox |
| | Clay A Cox |
| | Katherine M Goldsmith |
| | Matthew S Goldsmith |
| | Judith A McDonald |
| | Timothy McDonald |
| | William J McDonald |
| | Christopher J Rodenfels |
| | Jeffrey Schulein |
| | Linda Schulein |
| | William J Wieseler |

**Document Number:** 129

**Docket Text:**
**Opposition re: MOTION for Summary Judgment as to Plaintiffs' First and Second Claims for Relief [122] filed by Plaintiffs Jane S Barr, Robert H Barr, Christine L Cox, Clay A Cox, Katherine M Goldsmith, Matthew S Goldsmith, Judith A McDonald, Timothy McDonald, William J McDonald, Christopher J Rodenfels, Jeffrey Schulein, Linda Schulein, William J Wieseler. (Attachments: # (1) Supplement, # (2) Supplement)(Seltzer, Marc)**

**8:11-cv-01891-AG-AN Notice has been electronically mailed to:**

Aaron Lee Arndt    aarndt@foleybezek.com

Bruce A Wessel    bwessel@irell.com, vholb@irell.com

Caleb J Bartel    cbartel@irell.com

Colin T Roth    croth@irell.com

Daniel P Lefler    dlefler@irell.com

David Siegel    dsiegel@irell.com, rgrazziani@irell.com

Davida P Brook    dbrook@susmangodfrey.com, eball@susmangodfrey.com

James T Southwick    jsouthwick@susmangodfrey.com, jmccrary@susmangodfrey.com

John A Stillman    jstillman@goodwildman.com

Justin P Karczag    jkarczag@foleybezek.com, cconnors@foleybezek.com, cwalker@foleybezek.com, ehuffman@foleybezek.com, kgamarnik@foleybezek.com, rbehle@foleybezek.com

Kevin D Gamarnik    kgamarnik@foleybezek.com

Krysta Kauble    kkauble@susmangodfrey.com, mwilliams@susmangodfrey.com

Lindsey N Godfrey    lngodfrey@susmangodfrey.com, rshanks@susmangodfrey.com

Marc M Seltzer    mseltzer@susmangodfrey.com, hdanielson@susmangodfrey.com

Melissa R McCormick    mmccormick@irell.com

Robert Allen Curtis    rcurtis@foleybezek.com, cconnors@foleybezek.com, jkassity@foleybezek.com

Thomas Foley    tfoley@foleybezek.com, aarndt@foleybezek.com, cconnors@foleybezek.com

Todd M Sorrell    todd.sorrell@nortonrosefulbright.com, mylene.ruiz@nortonrosefulbright.com

William R H Merrill    bmerrill@susmangodfrey.com, pgoff@susmangodfrey.com

**8:11-cv-01891-AG-AN Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\2014-04-07 PDC - Plaintiffs Opposition to Mtn for Summary Judgment.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=4/8/2014] [FileNumber=17287441-0]

[215997019300b4cfa930600854b8f0f02c5b4a8038bc9591322f3a723ea5d115d761
5d7449751628211c92ec365c6fc5e1f23280a25cce7005dc38bd2553dcca]]

**Document description:**Supplement
**Original filename:**C:\fakepath\2014-04-07 PDC - Plaintiffs Statement of Genuine Issues of Material Fact.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=4/8/2014] [FileNumber=17287441-1]
[bc50fb43265aed47bd876f9b83639a4a75fe7344f188df0ccbcfc014d339bbe2f54e
e1e3c5fa3364234940b60b7e8384474cff5486583c45a2d432002dad9b5f]]

**Document description:**Supplement
**Original filename:**C:\fakepath\2014-04-07 PDC - Plaintiffs Motion to Strike Decls to Defs Motion for
Summary Judgment and Partial Summary Judgment.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=4/8/2014] [FileNumber=17287441-2]
[a6c0b9a869e9a1e8971108d2e633569f208ceebab7f31fd23541cf8b82c0f8f1e9b5
8552b2e0cb06425b851128bf2571893001cd50df665e8451bc30ce48d3e0]]